## HARDIN *v.* JORDAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 161.    Argued January 23, 26, 27, 1891.—Decided May 11, 1891.

In ejectment a plaintiff must stand or fall by his own title, and cannot avail himself of a defect in the title of the defendant.

Grants by the United States of its public lands bounded on streams and other waters, made without reservation or restriction, are to be construed, as to their effect, according to the law of the State in which the lands lie.

It depends upon the laws of each State to what extent the prerogative of the State to lands under water shall extend. The cases reviewed.

A judicial decision of the present day, made by the court of highest authority in Great Britain, is entitled to the highest consideration on a question of pure common law.

By the common law, under a grant of lands bounded on a lake or pond which is not tide-water and is not navigable, the grantee takes to the centre of the lake or pond, ratably with other riparian proprietors if there be such: and this rule prevailed in Illinois when the patent to the plaintiff's ancestor was granted in 1841, and is still the law of that State, notwithstanding the opinion of its highest court in *Trustees of Schools* v. *Schroll*, 120 Illinois, 509.

The ruling of the Supreme Court of Illinois in its opinion in *Trustees of Schools* v. *Schroll*, 120 Illinois, 509, that a grant of lands bounded by a lake or stream does not extend to the centre thereof, was not necessary to the decision of the case, and, being opposed to the entire course of previous decisions in that State, it is disregarded.

The adverse decision of the land department does not estop plaintiff, because it had no jurisdiction over the case.

EJECTMENT. Judgment for the defendant. The plaintiff sued out this writ of error. The case is stated in the opinion.

*Mr. Thomas Dent* for plaintiff in error.

*Mr. W. C. Goudy* for defendant in error.

. Mr. JUSTICE BRADLEY delivered the opinion of the court.

This is an action of ejectment brought by Gertrude H. Hardin, the plaintiff in error, to recover possession of certain fractional sections of land lying on the west and south sides of a small lake in Cook County, Illinois, situate about a dozen miles south of Chicago, and two or three miles from Lake Michigan; and also to recover the land under water in front of said fractional sections and land from which the water retires at low water. The lake is two or three miles in extent, and the main question in the cause is, whether the title of the riparian owner on such a lake extends to the centre of the lake, or stops at the water's edge. The court below decided that the plaintiff's title only extended to low-water mark, and to that extent gave judgment for the plaintiff, but as to all the land under permanent water, gave judgment for the defendant. The question is of much importance, and deserves a careful consideration. Some question was made in the argument whether the pleadings presented the points at issue with sufficient distinctness. We think they do, and shall not waste any time on that point.

The annexed diagram shows the situation of the property, as delineated on the plat of the government survey, made in 1834–5. The plaintiff claimed under a patent from the United States, granted to her ancestor, John Holbrook, in 1841, for the following fractional quarter sections, to wit: S.E. fractional quarter of section 19, N.E. fractional quarter of section 30 and east part of S.E. fractional quarter of section 30, designated by the letters A, B and C on the plat. The defendant disclaimed any interest in the fractional quarter sections themselves, but claimed all the land in front of them, whether covered with water or not, by virtue of various patents granted in 1881.

The cause was twice tried before the court without a jury;

Opinion of the Court.

Outline of official plat of the Fractional Township 37 North, Range 15 East, as per government survey of 1834–5.

Holbrook's patent, under which plaintiff claims, was for S.E. fractional ¼ Sec. 19; N.E. fractional ¼ Sec. 30; East fraction S.E. ¼ Sec. 30, designated by the letters A, B, C.

first, before Judge Blodgett in 1883; and, secondly, before Judge Gresham in 1885, a second trial in an action of ejectment being allowed as of course under an Illinois statute. Hurd's Rev. Stat. Ill. 599; Ill. Rev. Stat. 1845, p. 208. The same result was arrived at on each trial. Judge Blodgett delivered an opinion which is reported in 16 Fed. Rep. 823. Judge Gresham did not deliver an opinion. He made a special finding of facts, on which judgment was rendered, and a bill of exceptions presents the evidence offered by the defendant in opposition to the plaintiff's claim. This evidence tended to prove that there was, in fact, within the meander lines of the public survey of the lake a streak or tongue of upland not covered by water at its ordinary height; and showed the action of the land department in ordering a survey of the bed of the lake, and a grant of the same to different parties — which evidence was objected to by the plaintiff, and an exception taken. The result of this evidence is expressed in the special finding of the court.

The special finding of facts was as follows:

"(1.) That plaintiff is seized in fee of the southeast fractional ¼ of section nineteen (19), the northeast fractional ¼ and the east fraction of the southeast fractional ¼ of section thirty (30), all in township thirty-seven (37) north, of range fifteen (15) east, in Cook County, State of Illinois, as per patent from the United States of America to John Holbrook, plaintiff's ancestor, dated May 20, 1841, in which patent the grant of said lands is recited to be 'according to the official plat of the survey of the said lands returned to the General Land Office by the surveyor general;' that said patent was based upon an entry by said John Holbrook, made in the year 1838, at the United States land office in Chicago, Illinois.

"(2.) The government survey of lands in fractional township thirty-seven (37) aforesaid was made in the years 1834 and 1835, and the field-notes thereof as to the lands in question were as follows, to wit: [The field-notes are then given *in extenso*, expressly describing the meander line of the fractional sections as being "*along the margin of the lake*," from the intersection of the south margin thereof with the Indiana

state line, and thence going westwardly, northwardly and east-wardly, around the entire contour of that portion of the lake which is situated in the State of Illinois. The finding of the court then introduces the plat made from said survey and field-notes for the local land office, the surveyor general's office, and the General Land Office, which shows the said fractional sections bounded on said lake, and the words "Navigable lake" written on the body of the portion representing the lake, as in the annexed diagram. The finding then proceeds as follows:]

"(4.) The body of water shown upon the plat referred to as a navigable lake was in fact meandered by the surveyor, the meander line being run substantially upon the margin of said lake, as shown by said plat, save as follows, viz.: That the said line was carried across a certain ridge of land extend-ing from the centre of fractional sec. 20, in said township, in a southerly direction towards the point of land shown in said plat as comprising the east fraction of the southeast quar-ter of sec. 30 and fractional sec. 29, in said township, said ridge or strip of land thus projecting into said body of water southerly about 220 rods, being of varying width and eleva-tion and covered with timber — oak, hickory, elm, ash, poplar, linden and hackberry — three feet in diameter and under; the width of said ridge, limiting it to dry land at ordinary stage of water, being over 28 rods at the north and of varying width, being in some places slightly wider and at some nar-rower, extending to a depression about 140 rods south; and thence south of a general character but slightly narrower and lower a distance of about 80 rods, at the last-named point said ridge disappearing, and from there to a point south about 80 or 90 rods the bed and growth are of the same general character as the bed and growth along the margin of the lake, and on either side of the ridge reeds and coarse grass growing in the water and there being nothing but such growth to obstruct the flow of water from one side to the other, the depth at this point being sufficient at high water to enable skiffs and small boats to be rowed through from one side to the other, the water west having for many years been known

as Hyde Lake, in ordinary speech, while that to the east has been currently known as Wolf Lake, said space or distance last described being marsh land at low water; that at the south limit of the tract last described is a small body of land known as Elm Island or Fogli's Place, of the extent of 1½ or 2 acres, upon which timber grows of the same character as that on said ridge, to the south of which for about 50 rods there is water at high stages and marsh at medium stages, at which point or distance the ridge appears again as dry land about 30 rods to a little east of north from the north point of the meander line of the point of land comprising fractional section 29, etc., before referred to, there being also a small knoll bearing a number of small trees or bushes about 20 rods northwest from the northerly point of the ridge last mentioned.

"Upon the entire western margin of the water shown on the plat and extending some 20 or 25 rods east from the meander line, and also on the east and west margin of the dry land of said ridge to the north, as well as in the space between said ridge and Elm Island and in the space above described south of said Elm Island, the vegetation is solely a marsh growth of reeds and coarse or swamp grass growing in the water and of a uniform character, and the same is true as to the southerly portion of the lake west of plaintiff's land in the east fraction of the southeast fractional ¼ of said section 30. The physical condition west of the meander of said east fractional, etc., is the same for a distance of 91 or more rods westerly as it is generally at and along said meander line, the same character of growth as aforesaid appearing in the water at ordinary and high stages for said distance west of said line, the greater part of plaintiff's said land in said east fraction of the southeast fractional quarter of said section 30 being wet and unfit for cultivation and only slightly higher than that to the west, there being $2\frac{4}{100}$ acres in said east fraction, treating the meander line as a boundary; in the form of a right-angle triangle, with its base resting on the south section line with the meander line as a western boundary thereof. The point at which to the south the open water of said lake

ceases and marsh grass begins is several rods north of the south line of said section 30. The physical conditions of the land and water are substantially what they were at the time of the original survey; that said lake or lakes are not navigable waters.

"(5.) At the time of said government survey there was a natural outlet for said lake towards the northeast into Lake Michigan through Wolf River, said river being about $1\frac{1}{2}$ miles long and from 6 to 14 feet in depth; but such outlet was and has continued to be subject to interruption by the formation of a sand bar across the mouth thereof upon the shore of Lake Michigan. There was also an outlet from the westerly portion of said lake into the Calumet River, shown on said plat as Little Kalamick, said outlet into the Calumet River running in a westerly direction through the fractional north $\frac{1}{2}$ of said section 30 to its connection with said Calumet River.

"(6.) The level of water in said lake or lakes is subject to fluctuations alike from the operation of the change of the level of Lake Michigan from storms, winds, etc., and also from the operation of rains, thaws, evaporations, etc.; but said 'lake' or lakes is or are occupied by permanent water, and substantially the entire bottom thereof is below the mean level of Lake Michigan, and the greater portion of it is below extreme low water in said Lake Michigan, so that said 'lake' or lakes never become entirely dry, nor has any considerable portion thereof within its margin, as shown by the said government plat, ever been fit for cultivation except as to said Elm Island and said ridge hereinabove described.

"(7.) That at times of high water, however produced, the water in said lake or lakes extends to and beyond the limits that it occupied at the time of said government survey.

"That a level of Lake Michigan has been adopted in all surveys in Cook County called datum; that the extreme rise and fall of Lake Michigan is from 5 feet above datum to one foot below datum; that the average level of water in Lake Michigan is about 1.8 feet above datum.

"That the level of water in said lake or lakes when the same reaches the level existing at the time of the government sur-

vey of 1834 and 1835 is 2.2 above datum and .4 ($\frac{4}{10}$) foot above the average level of Lake Michigan.

"(8.) That defendant and those under whom defendant claimed, constituting the defendants in said original causes which were consolidated into the present case, entered into and took possession of the lands described in the plaintiff's declaration, except so much of the southeast fractional ¼ of section 19, the northeast fractional ¼ of section 30 and the east fraction of the southeast fractional ¼ of said section 30 as lay beyond and outside of the meander line as run upon the margin of said lake by said government survey, and defendant was so in possession at the time of said suit and trial thereof. Upon the facts shown in evidence the plaintiff asked the court to hold and adjudge that, under the grant to plaintiff's ancestor, plaintiff, as a riparian proprietor, took to the centre of said so-called 'navigable lake,' and all the said lands granted to plaintiff's ancestor bordered upon said so-called 'navigable lake;' but the court refused to so hold, and, on the contrary thereof, held that the plaintiff's·lands in said sections 19 and that part of 30 west of said lake were bounded by said lake, the right of possession extending to low-water mark in said lake; but as to said east fraction of the southeast ¼ of section 30 the court held that the plaintiff was bounded by the meander line run by the U. S. surveyor and not entitled to claim said lake as her boundary; to which plaintiff excepts, etc."

Judgment was entered in conformity with this finding as follows, to wit:

"That as to the east fraction of the fractional southeast quarter of section thirty (30), township thirty-seven (37) north, range fifteen (15) east, of the third P. M., Cook County, Illinois, the defendant is not guilty.

"It is further adjudged and determined that the plaintiff is seized in fee of the southeast fractional quarter of section nineteen (19) and the northeast fractional quarter of section thirty (30), both in township thirty-seven (37) north, range fifteen (15) east, of the third P. M., Cook County, Illinois; that by the terms of the patent of said lands to John Holbrook, plaintiff's ancestor, the grant of said last-described lands

was bounded by and extends to a body of water along the easterly line shown on the government map or plat of the government survey as a 'navigable lake;' that plaintiff is entitled to claim to low water as her eastern boundary of said lands last described; that defendant, as to the parts of said last-described lands lying between the meander line run in the government survey and the margin of said lake at low water, is guilty of unlawfully withholding the possession thereof from the plaintiff; and it is therefore ordered and adjudged that the plaintiff have and recover of said defendant the possession of said lands so unlawfully withheld as aforesaid, including the dwelling-houses erected thereon by Andrew Ferrand and Chester B. Rushmore and any other structures thereon, and as to costs in this behalf they are apportioned at two-thirds ($\frac{2}{3}$) of all costs taxed in this cause to be paid by defendant and the remaining one-third by plaintiff, and that plaintiff have execution therefor and a writ of possession, etc. As to the residue of the lands described in plaintiff's declaration defendant is adjudged not guilty; to which judgment plaintiff, by her counsel, duly excepts."

The question to be determined on this writ of error is, whether the facts found by the court authorized the judgment rendered. According to the settled course in actions of ejectment, the court did not inquire into the validity of the title claimed by the defendants, as compared with that of the plaintiff, but confined itself to the question of the validity of the plaintiff's title to the land in dispute, on the assumption that the plaintiff must stand or fall by his own title, and not by reason of any defect in the title of the defendant. Recognizing this as the governing rule in the case, we are called upon to decide whether the title of the plaintiff, under the patent granted to her ancestor in 1841, extended beyond the limits of the actual survey, under the permanent waters of the lake in front of the land described in the patent, and not merely to the line of low-water mark, as held by the court below. It will be observed that the government surveys made in 1834–5 upon which the patent was issued, not only laid down a meander line next to the lake, but also described

said lines as running "along the margin of the lake;" and the plat of the survey, returned to the general and local land offices, and referred to in the patent for identification of the land granted, exhibited the granted tracts as actually bordering upon the lake; and the lake itself on said plat was marked with the words "Navigable lake," although the fact found by the court is that the lake was not and is not a navigable lake, but a non-navigable fresh-water lake or pond. The patent itself does not contain all the particulars of the survey, but the grant of the lands is recited to be according to the official plat of the survey of said lands, returned to the General Land Office by the surveyor general, thereby adopting the plat as a part of the instrument.

Such being the form of the title granted by the United States to the plaintiff's ancestor, the question is as to the effect of that title in reference to the lake and the bed of the lake in front of the lands actually described in the grant. This question must be decided by some rule of law, and no rule of law can be resorted to for the purpose except the local law of the State of Illinois. If the boundary of the land granted had been a fresh-water river, there can be no doubt that the effect of the grant would have been such as is given to such grants by the law of the state, extending either to the margin or centre of the stream, according to the rules of that law. It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the Federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary. *Railroad Co.* v. *Schurmeir*, 7 Wall. 272; *Jefferis* v. *East Omaha Land*

*Co.*, 134 U. S. 178; *Middleton* v. *Pritchard*, 3 Scam. 510; *Canal Trustees* v. *Haven*, 5 Gilm. 548, 558; *Houck* v. *Yates*, 82 Illinois, 179; *Fuller* v. *Dauphin*, 124 Illinois, 542; *Boorman* v. *Sunnuchs*, 42 Wiscousin, 233, 235; *Père Marquette Boom Co.* v. *Adams*, 44 Michigan, 403; *Clute* v. *Fisher*, 65 Michigan, 48; *Ridgway* v. *Ludlow*, 58 Indiana, 248; *Kraut* v. *Crawford*, 18 Iowa, 549; *Forsyth* v. *Smale*, 7 Bissell, 201; Rev. Stat. §§ 2395, 2396.   Mr. Justice Clifford in the case first cited says: " Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.   In preparing the official plat from the field-notes the meander line is represented as the border line of the stream, and shows to a demonstration that the water course, and not the meander line, as actually run on the land, is the boundary."   It has never been held that the lands under water, in front of such grants, are reserved to the United States, or that they can be afterwards granted out to other persons, to the injury of the original grantees.   The attempt to make such grants is calculated to render titles uncertain, and to derogate from the value of natural boundaries, like streams and bodies of waters.

With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted enures to the State within which they are situated, if a State has been organized and established there.   Such title to the shore and lands under water is regarded as incidental to the sovereignty of the State — a portion of the royalties belonging thereto and held in trust for the public purposes of navigation and fishery — and cannot be retained or granted out to individuals by the United States.   *Pollard* v. *Hagan*, 3 How. 212; *Goodtitle* v. *Kibbe*, 9 How. 471; *Weber* v. *Harbor Commissioners*, 18 Wall. 57.   Such title being in the State, the lands are subject to state regulation and control, under the condition, how-

ever, of not interfering with the regulations which may be made by Congress with regard to public navigation and commerce. The State may even dispose of the usufruct of such lands, as is frequently done by leasing oyster beds in them, and granting fisheries in particular localities; also, by the reclamation of submerged flats, and the erection of wharves and piers and other adventitious aids of commerce. Sometimes large areas so reclaimed are occupied by cities, and are put to other public or private uses, state control and ownership therein being supreme, subject only to the paramount authority of Congress in making regulations of commerce, and in subjecting the lands to the necessities and uses of commerce. See *Manchester* v. *Massachusetts*, 139 U. S. 240; *Smith* v. *Maryland*, 18 How. 71; *McCready* v. *Virginia*, 94 U. S. 391; *Martin* v. *Waddell*, 16 Pet. 367; *Den* v. *Jersey Co.*, 15 How. 426.

This right of the States to regulate and control the shores of tide waters, and the land under them, is the same as that which is exercised by the Crown in England. In this country the same rule has been extended to our great navigable lakes, which are treated as inland seas; and also, in some of the States, to navigable rivers, as the Mississippi, the Missouri, the Ohio, and, in Pennsylvania, to all the permanent rivers of the State; but it depends on the law of each State to what waters and to what extent this prerogative of the State over the lands under water shall be exercised. In the case of *Barney* v. *Keokuk*, 94 U. S. 324, we held that it is for the several States themselves to determine this question, and that if they choose to resign to the riparian proprietor rights which properly belong to them, in their sovereign capacity, it is not for others to raise objections. That was a case which arose in the State of Iowa with regard to land on the banks of the Mississippi, in the city of Keokuk, and it appearing to be the settled law of that State that the title of riparian proprietors on the banks of the Mississippi extends only to ordinary high-water mark, and that the shore between high and low-water mark, as well as the bed of the river, belongs to the State, this court accepted the local law as that which was to govern

the case. The same view was taken in quite a recent case with regard to titles on the Sacramento River under the law of California. *Packer* v. *Bird*, 137 U. S. 661. On the east side of the Mississippi, in the States of Illinois and Mississippi, a different doctrine prevails, and in those States it is held that the title of the riparian proprietor extends to the middle of the current, in conformity to the rule of the common law, that the beds of all streams above the flow of the tide, whether actually navigable or not, belongs to the proprietors of the adjoining lands. *Middleton* v. *Pritchard*, 3 Scammon, 510; *Morgan* v. *Reading*, 3 Sm. & Marsh. 366; *St. Louis* v. *Rutz*, 138 U. S. 226. In the one case, that of Iowa, the government grant was held to extend only to high-water mark; in the other cases, of Illinois and Mississippi, it was held to extend to the centre of the stream; being governed in both cases by the respective laws of the States, affecting grants of land bordering on the river. In the one case, the State, by its general law, does not allow the grant to enure to the individual farther than to the water's edge, reserving to itself the ownership and control of the river bed; in the other cases, the States allow the full common law effect of the grant to enure to the grantee, reserving to themselves only those rights of eminent domain over the waters and the land covered thereby which are inseparable from sovereignty. As was well said by the Supreme Court of Illinois in *Middleton* v. *Pritchard*, (qua supra), "Where the government has not reserved any right or interest that might pass by the grant, nor done any act showing an intention of reservation, such as platting or surveying, we must construe its grant most favorably for the grantee, and that it intended all that might pass by it. What will pass then by a grant bounded by a stream of water? At common law, this depended upon the character of the stream, or water. If it were a navigable stream, or water, the riparian proprietor extended only to high-water mark. If it were a stream not navigable, the rights of the riparian owner extended to the centre thread of the current. . . . At common law, only arms of the sea, and streams where the tide ebbs and flows, are deemed navigable. Streams above tide

water, although navigable in fact at all times, or in freshets, were not deemed navigable in law. To these, riparian proprietors bounded on or by the river, could acquire exclusive ownership in the soil, water and fishery, to the middle thread. of the current; subject, however, to the public easement of navigation. And this latter, Chancellor Kent says, bears a perfect resemblance to public highways. The consequence of this doctrine is, that all grants bounded upon a river not navigable by the common law, entitle the grantee to all islands lying between the main land and the centre thread of the current. And we feel bound so to construe grants by the government, according to the principles of the common law, unless the government has done some act to qualify or exclude the right. . . . The United States have not repealed the common law as to the interpretation of their own grants, nor explained what interpretation or limitation should be given to, or imposed upon the terms of the ordinary conveyances which they use, except in a few special instances; but these are left to the principles of law, and rules adopted by each local government, where the land may lie. We have adopted the common law, and must, therefore, apply its principles to the interpretation of their grant."

These views are referred to with strong approval by Chancellor Kent in a note to the third volume of his Commentaries, p. 427, sixth edition, being the last edition prepared under his own supervision.

We do not think it necessary to discuss this point further. In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie.

The next question for consideration, therefore, is what is the law of Illinois with regard to such grants. If it were not for the decision of the Supreme Court of that State in the case of *Trustees of Schools* v. *Schroll*, 120 Illinois, 509, we should not have the slightest hesitation on the subject. And we cannot divest ourselves of the impression that the opinion of the court in that case on the subject in hand is anomalous,

and opposed to the entire course of previous decisions in the State. It is our judgment that the law of Illinois, in this regard, is the common law, and nothing else; and that the opinion of the court in *Trustees &c.* v. *Schroll*, is not in accordance with the common law. We say the opinion of the court; for a reference to the report of the case will show that the decision did not necessarily rest on the question whether a grant of lands bounded by a lake or stream does or does not extend to the centre thereof; for the court before whom the case was tried without the intervention of a jury, declared that there was no proof to show that the lots conveyed bordered on a lake or stream. The lands in question in that case were part of a 16th section granted to the State as school lands, and the school trustees of the township brought ejectment to recover them. They embraced certain land covered with the water of a portion of Lake Meredosia — a lake five or six miles long near the Illinois River. The defendants claimed the premises by virtue of certain patents from the State for lots which they alleged were bounded by the lake. But the patents contained no such intimation, and there was no proof of the fact. The lots were conveyed by a plat, and that did not show that they were situated on the lake. Under these circumstances the judgment was necessarily given for the plaintiffs, who stood in the place of the State. The court, however, without, as it seems to us, being required to do so, undertook to lay down the law as to the rights of grantees of lands bordering on lakes and ponds, as distinguished from running streams, holding to the Massachusetts doctrine that such waters belong to the State and are held for the use of the public, and do not pass to the riparian proprietors. Nearly all of the authorities referred to in support of this position are decisions of the courts of Massachusetts and of other New England States which follow their lead — the court not adverting to the fact that the law of Massachusetts stands on a peculiar colonial ordinance adopted more than two centuries ago, and referred to hereafter.

That the common law is the true and only law of Illinois on the subject of land titles, and especially as to the rights of

riparian owners, and the construction of deeds and grants of land bounded by streams and permanent bodies of water (except the great navigable lakes before referred to) is so clearly shown by the statutes and by the whole course of the decisions of the Supreme Court of that State, that it hardly needs any argument to support the proposition. Illinois was a portion of the Northwest Territory which Virginia always claimed as a part of her domain until she ceded it to the United States, and which received from that State many of its original settlers, who regarded Virginia as their parent State, and had a strong attachment for its institutions and laws, and may be said to have carried those laws with them. The very first enactment of the legislature of Illinois after it became a State was almost an exact copy of an ordinance adopted by the Virginia Convention of Delegates in May, 1776, declaring what laws should be in force under the new order of things. It was approved February 4th, 1819, and was entitled "An act declaring what laws are in force in this State." It enacted "that the common law of England, all statutes or acts of the British Parliament made in aid of the common law prior to the 4th year of the reign of King James the I, excepting the 2d section of the 6th chapter of 43 Elizabeth, the 8th chapter of 13 Elizabeth and 9th chapter of 37 Henry VIII, and which are of a general nature and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force, until repealed by legislative authority.

This statute, as far as we are able to learn, has never been repealed, and no supplementary or amendatory statute relating to the subject in hand has ever been passed by the legislature. Except with regard to Lake Michigan, which is a navigable lake and one of the internal seas of the country, it cannot be pretended that the common law relating to grants of land abutting on streams and permanent bodies of water, and to the rights of riparian owners, are of such a local character peculiar to England as to be inapplicable to the State of Illinois. At all events, the courts of that State from its origin to the present time have adhered to the rules of the common

law in reference to the matters referred to. So strictly has this principle been followed that even in the case of lands bordering on the Mississippi River, acknowledged to be one of the most important of navigable streams in the world, the rules of the common law, which extend the title of the riparian owner to the centre of the stream, have been sedulously observed; and we believe that there was never any departure from this course of decision until the case of the *Trustees of Schools* v. *Schroll*, which we regard as altogether exceptional, and insufficient to effect a change in the general rule. If anything can be deemed settled in the jurisprudence of a State, we think that until the decision of that case it was absolutely settled in Illinois that the rule of the common law was the law of that State in regard to the rights of riparian owners. See *Middleton* v. *Pritchard*, 3 Scam. 510; *Canal Trustees* v. *Haven*, 11 Illinois, 554; *Beckman* v. *Kreamer*, 43 Illinois, 447; *Chicago* v. *Laflin*, 49 Illinois, 172; *Chicago & Pac. Railroad* v. *Stein*, 75 Illinois, 41; *Houck* v. *Yates*, 82 Illinois, 179; *Washington Ice Co.* v. *Shortall*, 101 Illinois, 46; *Fuller* v. *Dauphin*, 124 Illinois, 542. The last of the above cited cases was decided in May, 1888, and reaffirmed in all things the case of *Middleton* v. *Pritchard*. The land in question was an island of five acres in what is called Plum River Slough, a large running slough or arm of the Mississippi River, marked on the original plat and survey as "Navigable Plum River Slough." The defendant claimed title under a patent from the United States, dated in 1845, for a fractional quarter section of land bounded on the west by a meander line according to the survey, but by the slough itself according to the plat of the survey referred to in the patent. The court held that the fractional section granted was bounded by the slough, and that the title extended to its centre, and included the island in question. The case of *Washington Ice Co.* v. *Shortall* was a contest about the right to cut ice on the Calumet River within the limits of the plaintiff's land. The ice company claimed such a right because, as they contended, the plaintiff had no private ownership in the water of which the ice was formed. But the court held that as the plaintiff was the

owner of the bed of the river, which flowed through his premises, he was the owner of the ice which became attached thereto.  Mr. Justice Sheldon, delivering the opinion of the court, after stating the common law rule as to the title of a riparian owner on a stream above tide water, said: "This rule of the common law has been adopted in this State, and is here the settled doctrine."  He then discussed the question as to the right to the ice, which was decided to be in the owner of the land.

The disposal of the present case, therefore, seems to us to require, further, only an answer to the single question, "What is the common law in regard to the title of fresh-water lakes and ponds?"  And on this subject we think there can be but very little difference of opinion.

Of course, as already stated, there is no question where the land abuts and bounds upon a fresh-water stream or river. In such cases the law is perfectly plain.  Sir Matthew Hale says: "Fresh rivers, of what kind soever, do of common right belong to the owners of the soil adjacent, so that the owners of the one side have, of common right, the propriety of the soil, and consequently of the right of fishing, *usque ad filum aquæ;* and the owners of the other side the right of soil or ownership and fishing unto the *filum aquæ* on their side. And, if a man be owner of the land of both sides, in common presumption he is owner of the whole river, and hath the right of fishing according to the extent of his land in length." De Jure Maris, P. I, c. 1.  And whilst Hale speaks of rivers and streams, he probably means to include, certainly does not mean to exclude, all fresh waters, including lakes and ponds as well.  But in England proper there are so few lakes and ponds of large size, and so many fresh-water streams and rivers, that in speaking of interior or fresh waters it was natural to refer to the latter without mentioning the former. Lord Coke, however, when enumerating the different things that are comprehended under the term "land" as a subject of ownership, mentions land covered with water.  His words are: "Also the waters that yield fish for food and sustenance of man are not by that name demandable in a *præcipe;* but

the land whereupon the water *floweth* or *standeth* is demandable; as for example, *viginti acras terræ aquâ coopertas* — twenty acres of land covered with water." Co. Litt. 4 a. And after showing that the right of fishery may be granted by the owner distinct from the right of soil, he adds: "If a man grant *aquam suam*, the soil shall not pass, but the fishery within the water passeth therewith." But where a collection of water has acquired a specific name he says that the land may be included under that name, as "*Stagnum*, a poole, doth consist of water and land, and therefore by the name of *stagnum* or poole, the water and land shall pass also." So of a gorse or gulf, for which a *præcipe* will lie with the esplées in taking of fish therefrom. Co. Litt. 5 b. This shows that still water as well as rivers and streams was the subject of private ownership by the old English law.

It may also be observed that the whole doctrine of common and several fisheries is corroborative of this view. The cases are innumerable in which actions of trespass have been sustained for fishing in a several fishery, (which is the exclusive right to fish in one's own waters, or is derived therefrom by grant); or in which the action of trespass has been defended by the plea of common of fishery (which is the right to fish in the waters of another). The right of public fishery is never mentioned except in connection with tide waters where the title to the land is in the Crown. It is never said that this right exists in lakes or ponds, or in any other fresh waters.

An expression used by Sir Francis Moore, in his reading on the Statute of Uses, has been supposed to indicate that common ponds are royalties of the Crown. But attention to the context will show that this inference is without foundation. He is speaking of different things that would be proper objects of charity under the several heads enumerated in the act; and under that of "*ports and harbors*," after showing the benefits of ports and harbors, and that an imposition of duties for their support would be a charitable use, he adds, "*Common ponds* or watering places are within the equity of these words." That is, a donation made for establishing and maintaining a pond or watering place would be a good charity, and within

the equity of gifts for ports and havens. This certainly is very far from intimating that ponds and watering places belong to the Crown. It only shows that, like churches, schools and other good institutions, they are calculated to subserve the public benefit.

In Scotland, where there are many lakes, often of large extent, there has never been any doubt on the subject. It is true their system of laws is founded on the civil law, by which lakes and ponds are regularly of private ownership. Lord Selborne, in *Mackenzie* v. *Bankes*, 3 App. Cas. 1324, 1338, says: "It is to these facts that the law of Scotland with respect to the rights of riparian proprietors in inland lakes has now to be applied. Under titles such as those by which both the competitors in the present case hold (and when nothing turns upon any evidence of exclusive possession) the entire lake, if surrounded by the land of a single proprietor, belongs to that proprietor as a 'pertinent' of his land. If there are more riparian proprietors than one, it belongs 'ratably' to them all. So far as relates to the *solum* or *fundus* of the lake, it is considered to belong in severalty to the several riparian proprietors, if more than one; the space enclosed by lines drawn from the boundaries of each property *usque ad medium filum aquæ* being deemed appurtenant to the land of that proprietor, exactly as in the common case of a river." But as to the rights of boating, fishing and fowling, Lord Selborne added: "These are to be enjoyed over the whole water space by all the riparian proprietors in common, subject (if need be) to judicial regulation." See also, to the same purport, Burge, Col. & For. Law, vol. 3, p. 425; Justinian's Digest, lib. 8, tit. 3, f. 23, § 1. And centuries before Justinian, Cicero spoke of the many lands, houses, *lakes, ponds*, places and possessions confiscated by Sylla and conferred upon his own favorites. Agra. Law, Orat. 3, c. 2: 7.

As many features of the common law with regard to the rights of riparian owners were borrowed directly from the civil law, Hale De Jure Maris, P. I, c. 6, page 28, it would not be strange if the rule relating to lakes and ponds came from the same source. It was recommended by the same reasons

that applied to fresh-water rivers and streams. When land is bounded by a lake or pond, the water, equally as in the case of a river, is appurtenant to it; it constitutes one of the advantages of its situation, and a material part of its value, and enters largely into the consideration for acquiring it. Hence the presumption is that a grant of land thus bounded is intended to include the contiguous land covered by water. Besides, a lake or pond, like a river, is a concrete object, a unit, and when named as a boundary, the natural inference is that the middle line of it is intended, that is, the line equidistant from the land on either side. If the margin is named as the boundary the case is different; the land under the water being then expressly excluded. Of course, these observations do not apply to our great navigable lakes, which are really inland seas, and to which all those reasons apply which apply to the sea itself.

But we are not without express authority, in addition to that of Lord Coke, as to the rule of the common law. As before observed, the small number in England of the bodies of water of the kind now under consideration, would lead us to expect but few decisions on the subject compared with those relating to rivers and streams. But the precise question has been brought before the courts in recent times, and has been decided as from the reason of the thing we should anticipate it would be. *Bristow* v. *Cormican,* 3 App. Cas. 641, is directly in point, and received the consideration of the best legal minds of England. It related to riparian rights in Lough Neagh, a lake in the North of Ireland, about fifteen miles in length (north and south) and about ten miles in breadth, situated some fifteen miles west of Belfast, and having the town of Antrim near its northeastern extremity. The plaintiff sued the defendants in trespass for fishing in the lake, and deraigned title from the Crown by a grant made in the time of Charles II of all the fishings in Lough Neagh; and the question was whether the Crown had the right to make such a grant. The decision was unanimous that it had not. Lord Cairns, then Lord Chancellor, said: "The Crown has no *de jure* right to soil or fisheries of a lough like Lough Neagh. Lough Neagh is,

as your Lordships are aware, the longest inland lake in the United Kingdom, and one of the largest in Europe. It is from fourteen to sixteen miles long, and from six to eight miles broad. It contains nearly 100,000 acres; but though it is so large, I am not aware of any rule which would, *prima facie,* connect the soil or fishings with the Crown, or disconnect them from the private ownership either of riparian proprietors or other persons." Lord Hatherley said: "This is an inland lake, and, therefore, it is not a portion of land belonging to the Crown by reason of its being on the shore of the sea, or a navigable strait or river." Lord Blackburn added: "The first question that I shall discuss is whether it is conclusively shown that Charles II had in 1660 and 1661, title to the property he purported to . . . convey. I think he had not. The property in the soil of the sea and of estuaries, and of rivers in which the tide ebbs and flows is, *prima facie,* of common right, vested in the Crown; but the property of dry land is not of common right in the Crown. It is clearly and uniformly laid down in our books, that where the soil is covered by the water forming a river in which the tide does not flow, the soil does of common right belong to the owners of the adjoining land; and there is no case or book of authority to show that the Crown is of common right entitled to land covered by water, where the water is not running water forming a river, but still water forming a lake." Then, after taking notice of a hesitating remark on the subject made by Justice Wightman in *Marshal* v. *Ulleswater Nav. Co.,* 3 Best & Smith, 732, 742, and of the apparent inconvenience of adjoining owners of small holdings on the borders of a lake going out to the centre, he adds: "It is, however, necessary to decide whether the Crown has of common right a *prima facie* title to the soil of a lake; I think it has not. I know of no authority for saying it has, and I see no reason why it should have it."

Of course this decision has not the controlling authority which it would have had if it had been made before our revolution. But it is the judicial decision of the highest authority in the British empire, and is entitled to the greatest consideration on a question like this, of pure common law.

In this country there has been a diversity of opinion on the subject. The colonial ordinance of Massachusetts, adopted in 1641, provided that great ponds containing more than ten acres of land, and lying in common, though within the bounds of a town, should be free for fishing and fowling. As amended by the ordinance of 1647, it prohibited the towns from granting away great ponds, but affirmed their power to regulate the fisheries therein as well as in tide waters, and affirmed the power of the legislature to dispose of great ponds, tidal bays, coves and rivers, or of the common rights of fishing and fowling in them. Gould on Waters, § 84; *Paine* v. *Woods*, 108 Mass. 160, 169; *Commonwealth* v. *Vincent*, 108 Mass. 441, 445. These ordinances seem to have been the foundation of a local common law in Massachusetts (including Maine) which has led to a course of decisions with regard to the title of lakes and ponds at variance with the general common law, and which have been followed in New Hampshire and some other States. It is there held that the land under water in such lakes and ponds belongs to the State, and not to the riparian owners; and that when land is conveyed bounding upon a natural lake or pond, the grant extends only to the water's edge. The leading cases to this effect are collected in Angell on Water Courses, secs. 41, 41a, etc. For later decisions see Encyclopædia of Law, vol. 12, tit. "Lakes and Ponds."

In other States the rule of the common law has prevailed as enunciated in *Bristow* v. *Cormican*, as in New York, New Jersey, Ohio, Michigan, Indiana, etc. See *Ledyard* v. *Ten Eyck*, 36 Barb. 102; *Smith* v. *City of Rochester*, 92 N. Y. 463; *Cobb* v. *Davenport*, 3 Vroom (32 N. J. Law) 369; *S. C.* 4 Vroom, 223; *Lembeck* v. *Nye*, 47 Ohio St. 336; *Clute* v. *Fisher*, 65 Michigan, 48; *Ridgway* v. *Ludlow*, 58 Indiana, 248.

In *Ledyard* v. *Ten Eyck* a large tract of land was granted to A, the bounds of which included the south end of Cazenovia Lake, a body of water five miles long and three-fourths of a mile wide. A granted to B (under whom the defendant claimed) a piece of the land bordering on the lake. It was held that by the common law, which was in force in New York,

both grants conveyed the title of the land under the water. "The premises of the defendant," said the court, "are not bounded on the west by the *bank* of the lake, but are bounded by the lake itself. . . . The deed would have the usual legal effect, and as an appurtenance would carry along the land under water to the centre." It was assumed that the same law applied to inland unnavigable lakes as to rivers. As to the Great Lakes, (Lake Champlain for example,) and the navigable rivers of the State, the Hudson and Mohawk, the courts of New York hold that the title of their beds is in the State and not in the riparian owners. *The People* v. *Canal Appraisers*, 33 N. Y. 461; *Smith* v. *City of Rochester*, 92 N. Y. 463. The latter case related to Hemlock Lake, which is seven miles long and half a mile wide, and navigated by scows, steamboats and other craft. The legislature of the State authorized the city of Rochester to take the water of the lake for the use of the inhabitants of the city, subject to the payment of damages for injury to private property. The plaintiff owning mills which were driven by the waters of the lake applied for an injunction to restrain the city authorities from taking the water; and the defence was that the lake was the property of the State, and that the State had a right to dispose of the water. The opinion of the Court of Appeals by Chief Justice Ruger exhibits a careful and able examination of the law on the subject. After adverting to the constitution of the State, framed in 1777, by which the common law, and the statutes of England and the colony were continued as the law of the State, subject to such alterations as the legislature might make; and also adverting to the peculiar action of the legislature in assuming the ownership of the lands under the waters of the Mohawk and the Hudson above tide water; he takes up the case upon the general principles of the common law, and comes to the conclusion that Hemlock Lake is not such a body of water as under any rule entitles the State to claim the ownership of the bed, and that its only right was that of eminent domain by virtue of its sovereignty.

The case of *Cobb* v. *Davenport*, in New Jersey, was an action of trespass brought to assert the plaintiff's exclusive

right of fishing in Green Pond, a lake three miles in length. by one mile in breadth. The plaintiff had a grant, from the board of proprietors of East Jersey, of a tract of land which included the lake. The defendant contended that the lake belonged to the State and was not subject to private ownership. The decision was in favor of the plaintiff. Mr. Justice Depue delivered the opinion of the court, and discussed the case on common law principles. "In this State," said the learned judge, "there is nothing in topography or location that requires a departure from the rules of the common law. Unlike some of our sister States, we have no large inland lakes, which are, in fact, inland seas, upon which an extensive commerce is carried on, or which are the boundaries with a foreign nation. . . . Our system of land titles, and the decisions of our courts, have been in conformity with the common law on this subject, and whatever departure has been therefrom, has not been to enlarge the public domain at the expense of private ownership." The rules of the common law propounded for the decision of the case were thus stated: "By the common law, all waters are divided into public waters and private waters. In the former the proprietorship is in the sovereign; in the latter, in the individual proprietor. The title of the sovereign being in trust for the benefit of the public — the use, which includes the right of fishing and of navigation, is common. The title of the individual being personal in him, is exclusive — subject only to a servitude to the public for purposes of navigation, if the waters are navigable in fact. . . . And all the cases in which waters above the ebb and flow of the tide, such as great inland lakes and the larger rivers of the country, are held to be public in any other sense than as being subjected to a servitude to the public for purposes of navigation, are confessedly a departure from the common law."

In corroboration of the conclusion arrived at from the general principles of the common law, Justice Depue also referred to a charter granted by the legislature of New Jersey to the Morris Canal Company in 1824, by which the company was authorized to use the waters of Lake Hopatcong and

Green Pond for the purposes of the canal, subject to this pro-
vision, namely, "all loss and damages to the owners of said
ponds, or the lands flowed or otherwise used in obtaining
water for the same, being paid for, agreeably to the previous
provisions of this act." This was regarded as a legislative
recognition of the private ownership of these bodies of water.
That ownership depended, however, not on the statute, but on
the principles of the common law.

But we forbear to quote further the reasonings of the cases.
There are many more to the same effect, all going to demon-
strate what the rule of the common law is with regard to the
ownership of the beds of inland lakes, not of such size or
importance as to be classed with the great navigable lakes and
rivers of the country. We need not depend upon the English
case of *Bristow* v. *Cormican* alone, great as its authority nec-
essarily is; but are surrounded by a cloud 'of witnesses in our
own country whose testimony is in harmony with that decis-
ion. We will only refer to a single other case, decided in
Illinois itself in 1867, *Beckman* v. *Kreamer*, 43 Illinois, 447,
which, with the cases as to riparian rights on rivers and
streams, ought to be conclusive as to the common law in that
State. The case arose with regard to the right of fishing in
a small lake in Kankakee County, with an outlet to Kankakee
River, seven miles distant. From the state map we infer
that the lake was two or three miles in length. It abounded
in choice fish and was claimed by the plaintiffs as their private
property, they owning the surrounding lands. A party came
with teams, boats and a seine, which last they dragged in.
the. lake against the will and protest of the owners of the
land. The latter brought an action of trespass and recovered
damages. Mr. Justice Breese, in announcing the decision of
the court, laid down the following principle of law : " By the
common law, a right to take fish belongs so essentially to the
right of soil in streams or bodies of water, where the tide
does not ebb and flow, that if the riparian proprietor owns
upon both sides of such stream, no one but himself may come
upon the limits of his land and take fish there; and the same
rule applies so far as his land extends, to wit, to the thread of
the stream, where he owns upon one side only."

The reason for departing from the common law in cases of this kind is well and clearly stated by Judge Gresham in the case of *State of Indiana* v. *Milk*, 11 Bissell, 197; 11 Fed. Rep. 389. He there says: " Non-navigable streams are usually narrow, and the lines of riparian owners can be extended into them at right angles, without interference or confusion, and without serious injustice to any one. It was therefore natural, when such streams were called for as boundaries, to hold that the real line between opposite shore-owners was the thread of the current. The rights of the riparian proprietors in the bed of the stream; and in the stream itself, were thus clearly defined. But when this rule is attempted to be applied to lakes and ponds practical difficulties are encountered. They have no current, and, being more or less circular, it would hardly be possible to run the boundary lines beyond the water's edge, so as to define the rights of shore owners in the beds. Beaver Lake is seven and a half miles east and west, and less than five miles north and south. Extending the side and end lines into the lake, there being no current, when would they meet ? This rule is applicable, if at all, whether there be one or more riparian proprietors. I do not think the mere proprietorship of the surrounding lands will, in all cases, give ownership to the beds of natural non-navigable lakes and ponds, regardless of their size. It would be unfair and unjust to allow a party to claim and hold against his grantor the bed of a lake containing thousands of acres, solely on the ground that he had bought and paid for the small surrounding fractional tracts — the mere rim."

We do not think that this argument *ab inconvenienti* is sufficient to justify an abandonment of the rules of the common law, which, as we have shown, have been adopted in Illinois as the law of the land. It is too much like judicial legislation. It is as much as to say : " We think the common law might be improved, and we will, therefore, improve it." As to the supposed difficulty or inconvenience in applying the law, it is no greater than that which occurs on any bay or incurved shore, even of a large river, in adjusting the outgoing boundary lines between adjoining proprietors over the sub-

merged bottoms of flats lying in front of their riparian lands. Just and equitable rules have been adopted for settling the mutual rights of parties in such cases. Where a lake is very long in comparison with its width, the method applied to rivers and streams would probably be most suitable for adjusting riparian rights in the lake bottom along its sides, and the use of converging lines would only be required at its two ends. But whatever mode of determining the outgoing lines, as between adjoining owners, should be adopted in special cases, (which may be left for determination when they arise,) there can be no difficulty in the present case as between the plaintiff and the defendant. The latter is not an adjoining owner. The controversy here is between a riparian owner and a party claiming the land under water in front of him; and as between them, we think there is no question as to the riparian owner's right.

The Supreme Court of Michigan in a recent case (*Clute* v. *Fisher*, 65 Michigan, 48, since followed by *Stoner* v. *Rice*, 121 Indiana, 51) held that the riparian owner of a fractional lot bounded by a non-navigable lake only takes so much of the lake bottom as is required to fill out the section or quarter section of which he owns the fraction; in other words, that his common law right is limited by the sectional lines of the survey. It was conceded, however, that if the lake were so large that the lines of the granted sections would not embrace the whole lake bottom, then the riparian ownership would be extended to the centre so as to include the whole bottom. In this case the sectional lines included all that was in dispute, the question being raised upon the cutting of the ice on the surface. In the other case (*Stoner* v. *Rice*,) the rule so adopted gave to the riparian owner the whole of the lake bottom as against a subsequent grantee of the government; a result identical with that which would have been produced by the unmodified common law rule. These decisions, however, are interesting because they are founded on the principle that the government surveys form a system or network of lands in block, whose sectional and subsectional lines, whether actually surveyed on the land, or projected by the imagination through

standing bodies of water, constitute lines of limitation which arrest and restrict any extension of a grant by implication beyond them. This is substantially the principle by which the Roman *agri limitati* were governed. These consisted, generally, of districts or territories acquired by conquest, and assigned and set apart for the benefit of veteran soldiers, when retired from active service in the army. The method of surveying such a territory was to draw lines towards the four quarters of the heavens, parallel and crosswise, in order to effect a uniform division of the lots, and to fix immutable boundaries between them. These boundaries, called, *limites*, were marked by a slip of land left for the purpose untouched by cultivation, as balks or highways. The squares of land contained either thirty-three or a hundred and thirty-three acres; that is, they were either ten or twenty *actus* square. Lands thus surveyed and appropriated were called limited lands — *agri limitati* — and when they bordered on streams or other waters they were not entitled, as other riparian lands were, to any accretion or alluvion, or to islands in the stream, but were strictly confined to the lines by which they were actually or theoretically limited. See Dig. Lib. 41, tit. 1, frs. 7, 16; Lib. 43, tit. 12, fr. 1 §§ 6, 7; Gronovius, in note to Grotius, De Jure Bel. ac Pac., Lib. 2, cap. 3, sec. 16; Niebuhr's Hist. of Rome, vol. 2, App. I.

This method of disposing of the subject might be convenient and attended with some advantages if it were sanctioned by the law; but we do not see any greater reason for adopting this departure from the common law than that followed in the case of *State of Indiana* v. *Milk*, before referred to.

As to the narrow tongue of land which, according to the finding of facts, projects into the lake from the north side, we do not think that it can have any effect upon the decision of this case. It does not appear to have extended far enough southerly, at least during high water, to be opposed to the property of the plaintiff. Besides, the plat of the lake and the land surrounding it, referred to in the patent granted to Holbrook, exhibits the various fractional sections surrounding the lake as immediately bordering upon it; and this, as shown

by the authorities already cited, constitutes the lake itself the real boundary of the land, without regard to the meander line. There should be some extraordinary proof of mistake on the part of the surveyor in order to interfere with the passing of the land as riparian land. In the case of *Forsyth* v. *Smale*, 7 Bissell, 201, decided in the Circuit Court of the United States for the district of Indiana in 1876, the same circumstance of a gore or tongue of land running into the water beyond the meander line was shown by the proofs to exist. The plaintiffs claimed by patent from the United States certain fractional lots of land binding on Lake George, a small lake in Indiana, about two miles in length and three-fourths of a mile in width, connected with the lake now in question. The government plat referred to in the patents showed no such projection, but showed the fractional lots binding on the lake. The defendant claimed the gore or tongue of land under a subsequent patent, and contended that it was not embraced in the plaintiffs' title. But Judge Drummond held that the case was governed by the principles announced by this court in *Railroad Company* v. *Schurmeir*, and that as the plat referred to in the patent showed that the land conveyed was bounded by the lake, the patent should be so construed, and gave judgment for the plaintiff.

A question is made with regard to the effect of the proceedings which took place before the register and receiver of the local land office, and, by appeal, before the Commissioner of the General Land Office and the Secretary of the Interior, in relation to the right of the government to survey and grant the lands under Wolf Lake in 1874. Both Hardin and DeWitt were notified of said proceedings and appeared and contested the same; but the decision was against them and in favor of the government. It is contended that by this decision the question became *res judicata*, and that Hardin and DeWitt and those claiming under them are bound thereby. It is very true that the decisions of the land department on matters of fact within its jurisdiction, made in due course of administration, cannot be called in question collaterally. But, as was declared in the recent case of *Davis* v. *Weibbold*, 139 U. S.

507, decided at the present term of this court, "if the lands patented were not at the time public property, *having been previously disposed of*, or no provision had ·been made for their sale or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the lands, and their attempted conveyance by patent is inoperative and void." So that, if the lands had been "previously disposed of," the department has no jurisdiction over them; and the question whether they have, or have not, been previously disposed of is a judicial question, and not determinable by the executive department, except for the purpose of governing its own conduct in the administration of its functions. The same principle is involved in *Moore* v. *Robbins*, 96 U. S. 530, 533, 534, where it is said by Mr. Justice Miller, speaking for the court: "With the title passes away all authority or control of the executive department over the land, and over the title which it has conveyed. It would be as reasonable to hold that any private owner of land who has conveyed it to another can, of his own volition, recall, cancel or annul the instrument which he has made and delivered. If fraud, mistake, error or wrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to sue for the cancellation of the deed or reconveyance of the land as to individuals; and if the government is the party injured, this is the proper course." Again, referring to the power of the Secretary of the Interior after patent, it is said: "He is absolutely without authority. If this were not so, the titles derived from the United States, instead of being the safe and assured evidences of ownership which they are generally supposed to be, would be always subject to the fluctuating, and in many cases unreliable, action of the land office. No man could buy of the grantee with safety, because he could only convey subject to the right of the officers of the government to annul his title."

On the whole, our conclusion is, that the court below ought to have given judgment for the plaintiff, as against the defendant, to the centre of Wolf Lake, instead of to low-water mark, in front of the southeast fractional quarter of section 19, and

in front of the northeast fractional quarter of section 30; and to the middle of the bay or projection of said lake in front of the east part of the southeast fractional quarter of said section 30. If there should arise any question between the plaintiff and other riparian owners of lands situated on the margin of the lake, as to the convergence of the side lines of the plaintiff's land in the lake, it can be disposed of by the parties themselves by a resort to equity or to such other form of procedure as may be proper.

The judgment must be

*Reversed, and the cause remanded with instructions to enter judgment for the plaintiff in conformity with this opinion.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE GRAY and MR. JUSTICE BROWN, dissenting.

MR. JUSTICE GRAY, MR. JUSTICE BROWN and myself are unable to concur in the foregoing conclusions. Beyond all dispute the settled law of this court, established by repeated decisions, is that the question how far the title of a riparian owner extends is one of local law. For a determination of that question the statutes of the State and the decisions of its highest court furnished the best and the final authority. In the case of *St. Louis* v. *Rutz*, decided at the present term, 138 U. S. 226, 242, it was said by Mr. Justice Blatchford, speaking for the court: "The question as to whether the fee of the plaintiff, as a riparian proprietor on the Mississippi River, extends to the middle thread of the stream, or only to the water's edge, is a question in regard to a rule of property, which is governed by the local law of Illinois. *Barney* v. *Keokuk*, 94 U. S. 324, 338; *St. Louis* v. *Myers*, 113 U. S. 566; *Packer* v. *Bird*, 137 U. S. 661. In *Barney* v. *Keokuk*, it is said that if the States ' choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections.' " The cases referred to in this quotation affirm the same doctrine.

If we turn to the decisions of the Supreme Court of Illinois, we find one rule laid down for running water and another for

Dissenting Opinion: Brewer, Gray, Brown, JJ.

lakes and ponds. In the former case the riparian owner owns to the thread of the current; in the latter to the water line. No distinction is made on account of the size of either stream or pond. Without noticing the  thorities in reference to rivers or other running water, it   enough to refer to the decisions in reference to lakes and   nds. In the case of *Seaman* v. *Smith*, decided in 1860, 21 Illinois, 521, 525, it was held that a riparian owner on a large lake, Lake Michigan, took title only to the water line. The reason of that decision was thus expressed in the opinion of the court: "These great bodies of water, having no currents, like rivers and other running streams, cannot present the same reasons why the boundary should be extended beyond the water's edge, where it is ordinarily found, that apply to running bodies of water. Where such streams are called for as a boundary, the thread of the current is held to be the line from each side. Such a rule could not, for the want of a current, be adopted in this case. It would not be sanctioned either by analogy to the rule or by reason. And if the outer edge of the water be passed, owing to the approximation of these bodies to a circular shape, it would be found exceedingly difficult, if not impossible, to ascertain where the boundary should be fixed, or the shape it should assume." It will be perceived that the same reasoning applies whether the lake be a large or a small one. There is no decision or intimation by the Supreme Court of that State questioning the rule thus laid down.

Again, in 1886, in a later case, *Trustees of Schools* v. *Schroll*, 120 Illinois, 509, the question arose as to a small lake, no larger than the one in controversy, and the same rule was applied there as in the case of Lake Michigan ; and it was held that the title of the riparian owner stopped at the water line, and the case of *Seaman* v. *Smith, supra*, was cited as furnishing the authority and reasoning for the rule. Nor was this a mere casual or incidental remark in the course of an opinion. The opinion is some seven pages in length, and over four pages are devoted to a discussion and decision of this question. It was the principal and paramount question, fully reasoned out and obviously carefully considered. We quote as follows: "It is

equally well settled that grants of land bounded on streams or
rivers above tide water carry the exclusive right and title of
the grantee to the centre of the stream, *usque ad filum aquæ,*
subject to the easement of navigation in streams navigable in
fact, unless the terms of the grant clearly denote the intention
to stop at the edge or margin of the stream.  3 Kent's Com.
427; 2 Hilliard on Real Prop. 92; Angell on Water-courses,
sec. 5; *Jones* v. *Soulard,* 24 How. 41; *State of Indiana* v.
*Milk,* 11 Fed. Rep. 389; *Canal Appraisers* v. *The People,* 17
Wend. 571, 596; *Child* v. *Starr,* 4 Hill, 369; *Seaman* v. *Smith,*
24 Ill. 521; *Rockwell* v. *Baldwin,* 53 Ill. 19; *Braxon* v. *Bress-
ler,* 64 Ill. 488; *Washington Ice Co.* v. *Shortall,* 101 Ill. 46.
But an entirely different rule applies when land is conveyed
bounded along or upon a natural lake or pond.  In such case
the grant extends only to the water's edge.  Angell on Water-
courses, secs. 41, 42; 3 Kent's Com. 439, note a, citing *Brad-
ley* v. *Rice,* 13 Maine, 198, 201, and *Waterman* v. *Johnson,* 13
Pick. 261.  See also *Warren* v. *Chambers,* 25 Arkansas, 120;
*State of Indiana* v. *Milk,* U. S. Cir. Ct. Dist. Ind., Gresham,
J., 11 Fed. Rep. 389, citing *Wheeler* v. *Spinola,* 54 N. Y. 377;
*Mansur* v. *Blake,* 62 Maine, 38; *State* v. *Gilmanton,* 9 N. H.
461; *Paine* v. *Woods,* 108 Mass. 160; *Fletcher* v. *Phelps,* 28
Vermont, 257; *Austin* v. *Rutland Railroad Co.,* 45 Vermont,
215; *Boorman* v. *Sunnuchs,* 42 Wisconsin, 233; *Delaplaine* v.
*Chicago & Northwestern Ry. Co.,* 42 Wisconsin, 214, and
*Seaman* v. *Smith,* 24 Illinois, 521.  See also *Nelson* v. *Butter-
field,* 21 Maine, 229; *West Roxbury* v. *Stoddard,* 7 Allen, 158;
*Canal Co.* v. *The People,* 5 Wend. 423; *Jakeway* v. *Barrett,*
38 Vermont, 316; *Primm* v. *Walker,* 38 Missouri, 94, 99;
*Wood* v. *Kelley,* 30 Maine, 47." And again: "Indeed, the
controlling distinction between a stream and a pond or lake is,
that in the one case the water has a natural motion — a cur-
rent — while in the other the water is, in its natural state,
substantially at rest.  And this is so, independent of the size
of the one or the other.  The flowing rivulet of but a few
inches in width is a stream as certainly as the Mississippi.
And when lands are granted by the proprietor of both land
and stream, bounding such grant upon the stream, the grantee

acquires right and title to the thread or middle of the stream. This right is grounded upon the presumption that the grantor, by making the stream the boundary, intended his grantee to take to the middle of the stream; and this presumption will prevail until a contrary intent is made to appear. *Rockwell* v. *Baldwin*, 53 Illinois, 19. The right spoken of does not rest upon the principle that when a grant is bounded on a stream the bed of the stream to the thread or middle passes as incident or appurtenant to the bordering land, for the bed of the stream is land, though covered with water, and land cannot pass as appurtenant to land. As is said in *Child* v. *Starr*, 4 Hill, 369: 'A conveyance of one acre of land can never be made, by any legal construction, to carry another acre by way of incident or appurtenance to the first.' The riparian proprietor claiming to the thread or middle of the stream must show the bordering water to be a stream, and that his grant, in terms or legal effect, is bounded upon or along such stream — that the stream is made the boundary."

These quotations show that there was no mere inadvertent or casual remark, but that it was the distinct and well considered as it was also the unanimous decision of the highest court of the State. We do not think it sufficient to overthrow the force of this decision to say that the common law of England was different, a proposition which, in passing, we may say we doubt; nor that there was another question in the case also referred to in the opinion, which fully justified the decision; and that therefore the discussion and decision of this question were unnecessary, for that other question was put after this in the opinion, and was evidently intentionally made subordinate to this.

Believing that the law of Illinois has been determined by its Supreme Court, we think that determination is conclusive on this court. As strengthening the views we have expressed, may also be noticed the opinions of the Circuit and District Judges, in this very case, on separate trials, (see 16 Fed. Rep 823,) both announced before the decision in 120 Illinois, and agreeing that under the laws of Illinois the title of the riparian owner stopped with the water. The long judicial experience

of those judges and their familiarity with the laws of Illinois give to these opinions great weight. We, therefore, dissent from the conclusions of the court