## COMMONWEALTH *vs.* MATTHEW VINCENT.

Formal objections to a complaint, taken for the first time in the superior court on appeal from a conviction by a trial justice, and therefore invalid under the St. of 1864, *c.* 250, § 2, cannot be reported for the determination of this court even after verdict and with the consent of the defendant.

A pond more than twenty acres in area, connected with the sea only by a narrow channel, partly natural and partly artificial, not suited to any other use than the passage of fish, nor always sufficient for that purpose without being artificially cleared, and not a navigable stream within the definition of the St. of 1869, *c.* 384, is a great pond within the meaning of that statute, of which the commissioners of inland fisheries may make a lease under § 9.

The provisions of the St. of 1869, c. 384, § 9, for leasing great ponds exceeding twenty acres in area, for the purpose of cultivating useful fishes; and of § 19, for punishing whoever fishes without permission of the proprietors where fishes are lawfully artificially cultivated or maintained; include all kinds of fish, whether migratory or not.

The lease of a great pond by the commissioners on inland fisheries for the purpose f cultivating useful fishes under the St. of 1869, c. 384, § 9, renders the pond a place where fishes are lawfully artificially cultivated or maintained, within the provisions of § 19 for the punishment of whoever fishes in such a place without permission of the proprietors, so long as the occupation of the pond is not abandoned by the lessee, without regard to any neglect of his to fulfil the provisions of the lease.

The exclusive right of the lessee of a great pond for the purpose of cultivating useful fishes under the St. of 1869, c. 384, § 9, to fish therein, is not limited to the portion of the pond which he is authorized to occupy with inclosures and appliances to carry out the purpose of the lease.

The terms of a lease of a great pond for the purpose of cultivating useful fishes under the St. of 1869, c. 384, § 9, in respect to the taking of fish in the pond by the lessee, are within the discretion of the commissioners on inland fisheries.

The provision of § 9 of the St. of 1869, c. 384, that the appliances and inclosures used by the lessee of a great pond for the cultivation of useful fishes shall be so placed as not to debar ingress to or egress from the pond at proper places, does not necessarily require the placing of them so as not to debar ingress or egress at all times; and it is no objection to the lease that it provides that they shall be placed so as not to debar ingress or egress "at proper times."

COMPLAINT to a trial justice in Dukes County on the St. of 1869, c. 384, § 19, alleging that the defendant on March 6, 1871, at Tisbury, " did unlawfully fish for and take in a certain pond, called Tisbury Great Pond, there situate, one hundred herring and one thousand smelt, the whole of said pond being then and there a place where fish, to wit, herring and smelt, were then and there lawfully cultivated and artificially maintained by Allen Look " and other persons named, " he, the said Matthew Vincent, not having then and there permission from the said Allen Look " and his associates, " and not having then and there any permission from either or any of them to fish for and take the fishes so fished for and taken as aforesaid ; and they, the said Allen Look " and the others named with him, " being then and there the proprietors of the fishes so fished for and taken as afore-said ; against the peace of the Commonwealth and the form of the statute in such cases made and provided."

The defendant, being convicted before the trial justice, appealed to the superior court, and there moved to quash the complaint, for the following reasons :

" 1. It is no crime by the common law, for the defendant **to** fish in Tisbury Great Pond.

" 2. No statute forbids the defendant from fishing in the whole of Tisbury Great Pond ; but, if at all, only in that particular portion of the pond in which fishes could be lawfully artificially cultivated or maintained by inclosures and appliances for that purpose, not exceeding one tenth part thereof ; and the complaint does not aver that the alleged fishing took place within any such tenth part, but avers that the whole of the pond is forbidden ground within the meaning of the St. of 1869, *c.* 384.

" 3. The complaint nowhere avers that Tisbury Great Pond exceeds twenty acres in area ; or that there ever was any lease thereof by the fish commissioners to any person ; or that the persons named in the complaint, or any other person, occupied any portion of the pond with inclosures and appliances for the purpose of cultivating useful fishes."

This motion to quash was overruled by *Putnam,* J., who directed a verdict of guilty, which was returned ; and, by the defendant's desire and consent, he reported for the determination of this court the questions arising upon the motion and upon the following case :

" At the trial, it appeared that Tisbury Great Pond exceeded six hundred acres in area ; that it was a tidal pond, separated from the ocean by a narrow beach, through which there was a passage for the water to the ocean a large part of the year ; that this passage was partly natural and partly artificial ; that it was sometimes opened by the force of the water of the pond, and sometimes closed again by the action of the wind and waves ; that herring and smelt were migratory fish, and naturally frequented this pond when opened, by entering the same through this passage, for the purpose of spawning in the pond and tributary waters ; that the commissioners on inland fisheries, acting under § 9 of the St. of 1869, *c.* 384, on March 1, 1870, made a lease thereof to said Allen Look and others, a copy of which may be referred to by either party ; * that the lessees never occupied

---

\* By this indenture, the Commonwealth, by said commissioners, leases to Allen Look and others, " all riparian proprietors on a certain great pond situ-

or set apart any portion thereof with inclosures and appliances for the cultivation of useful fishes, and never did anything towards the cultivation and maintenance of useful fishes in the

ate in the towns of Tisbury and Chilmark, exceeding twenty acres in area, and commonly known as Tisbury Great Pond," " said Tisbury Great Pond for the purpose of the cultivation of useful fishes," "yielding and paying therefor to the treasurer of the town of Tisbury, as annual rent, one twentieth of the market value in said Tisbury of all fish, except eels, taken on said premises by said lessees in each year," " or, instead of the rent fixed as aforesaid, such annual sum as may be agreed on by said lessees with the selectmen of the town of Tisbury." " And the said lessees hereby covenant with said Commonwealth, that they, and their heirs, executors and administrators, will pay said rent in manner aforesaid ; that they will not occupy more than one tenth part of the premises aforesaid with the inclosures and appliances for the taking and cultivation of fishes as aforesaid ; that they will not avail themselves of the privileges of this lease to the prejudice of any public rights other than the taking and cultivation aforesaid; that they will so arrange their inclosures and appliances aforesaid as not to debar ingress to and egress from said premises at proper places and at proper times ; that they will not without the consent of said board of commissioners, expressed in writing, or of their successors, assign this lease, or underlet their right to take and cultivate as aforesaid, as to the whole or any part of said premises ; that they will allow said commissioners, personally or by their deputies, at all times to enter on said premises and to take fishes for purposes connected with fish culture and scientific observation ; that they will not sell fishes for food at seasons when their capture is prohibited by law ; that they will observe and obey all the laws of the Commonwealth relating to inland fisheries ; that they will allow no fishes to be taken in said premises, including the passage connecting them with salt water, in the interval between Saturday morning at sunrise in each week and the following Monday morning at sunrise ; that they will provide and maintain a suitable passageway for fishes into salt water at proper places and at proper times; and that they will not interfere with the right of the public to take eels on said premises with pots and spears, except within forty rods of the passage connecting said premises with salt water : Provided always, and this indenture is upon this condition ; that, in case of the breach of any of the covenants to be observed by the lessees, or in case said premises shall be taken from the lessees, or their representatives, by process of law, proceedings in bankruptcy, insolvency or otherwise, the said commissioners, or their successors, may, while the default or neglect continues, or at any time after such taking by process of law, without any notice or demand, enter on said premises and thereby determine the estate hereby conveyed, and may thereupon remove, forcibly if necessary, said lessees and those claiming under them, and their effects ; and on the

pond, except that, when the said passage or channel through the beach became closed up as aforesaid, they dug it out again sufficiently to start the water from the pond, when it became quite large by action of the water flowing in and out of the pond; that it had been customary, for many years prior to the lease, for certain fishermen and border owners to open this channel or passage, whenever it became necessary, or when directed so to do by the commissioners on drains and sewers; that no one had opened this passage since the lease was made, except the lessees; and that on March 6, 1871, the defendant took several herring and smelt in said pond, without the permission of said lessees, and contended that the lessees had not the right of an exclusive fishery in the whole of the pond."

*H. J. Fuller*, for the defendant.

*C. Allen*, Attorney General, *& J. C. Davis*, Assistant Attorney General, for the Commonwealth.

GRAY, J.  The motion to quash, so far as it rests upon formal defects, cannot be entertained, because it was not made before the trial justice to whom the complaint was originally presented. St. 1864, *c.* 250, § 2.  *Commonwealth* v. *Walton*, 11 Allen, 238. *Commonwealth* v. *Norton*, 13 Allen, 550.

The other questions presented by the report relate to the construction and effect of the St. of 1869, *c.* 384, and may be more conveniently approached by first stating a few general propositions of law, which were well established at the time of its passage.

The Body of Liberties, enacted by the general court of Massachusetts in 1641, contained this article:  "Every inhabi ant that is an householder shall have free fishing and fowling in any great ponds, and bays, coves and rivers, so far as the sea ebbs and flows within the precincts of the town where they dwell, unless the freemen of the same town or the general court have otherwise appropriated them; provided that this shall not be extended to give leave to any man to come upon other's propriety without their leave."   Body of Liberties, art. 16; 28 Mass. Hist. Soc.

---

further condition, that all fishes artifi·ially cultivated and maintained on said premises by the lessees, and not removed by them at the expiration of this lease, shall become the absolute property of the Commonwealth."

Coll. 219. This article was further explained in the ordinance of 1647, which declared that " no town shall appropriate to any particular person or persons any great pond containing more than ten acres of land;" that the title of the owners of lands next tide waters should extend over the flats, reserving the right of " passage of boats or other vessels in or through any sea, creeks or coves, to other men's houses or lands;" " and for great ponds lying in common, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass through any man's propriety for that end, so they trespass not upon any man's corn or meadow." Mass. Col. Laws (ed. 1660) 50; (ed. 1672) 90, 91; Anc. Chart. 148, 149. The earlier records of the colony show that the general court had not only, in establishing the boundaries of towns, where they touched great ponds, defined how much of every such pond should be deemed to be within each town; 1 Mass. Col. Rec. 144, 253; but had already made several grants to individuals of exclusive rights of fishing and fowling at particular places, either upon tide water or in great ponds, besides at least one such grant of a tract of land including the whole of a great pond. Ib. 94, 114, 127, 128, 147, 236, 277. *Stoughton* v. *Baker*, 4 Mass. 522, 527. *West Roxbury* v. *Stoddard*, 7 Allen, 158, 165. *Tudor* v. *Cambridge Water Works*, 1 Allen, 164.

This ancient ordinance, in its amended form, is the foundation of our law upon this subject. While it prohibits the towns from granting away great ponds, it expressly affirms their power to regulate the fisheries, both in such ponds and in tide waters, and that of the legislature to dispose either of great ponds, (as well of bays, coves and rivers within the ebb and flow of the tide,) or of the common rights of fishing and fowling in them. It has ever since been held that the right of fishing, both in the tide waters and in the great ponds, belongs to the public, unless otherwise appropriated by the legislature, or by the towns acting under its authority. *Coolidge* v. *Williams*, 4 Mass. 140. *Proctor* v. *Wells*, 103 Mass. 216. *West Roxbury* v. *Stoddard*, 7 Allen, 158, 166. In streams above the ebb and flow of the tide, the exclusive right of fishing is in the owners of the banks,

subject to the regulations of the legislature for the common ben·
efit. *Waters* v. *Lilley,* 4 Pick. 145. *Commonwealth* v. *Chapin,*
5 Pick. 199. *Vinton* v. *Welsh,* 9 Pick. 87. *McFarlin* v. *Essex
Co.* 10 Cush. 304, 309. *Commissioners on Inland Fisheries* v.
*Holyoke Water Power Co.* 104 Mass. 446, 450.

The power of the legislature of the Commonwealth over the
public rights of navigation and fishing in any waters within its
boundaries is unrestricted, provided it does not interfere with the
power to regulate commerce, conferred upon the general government by the Constitution of the United States. *Cooley* v. *Philadelphia Board of Wardens,* 12 How. 299. *Gilman* v. *Philadelphia,* 3 Wallace, 713. The legislature of a state has the power
to regulate the time and manner of fishing in the sea within its
limits ; and, according to the opinions of most respectable judges,
may even grant exclusive rights of fishing at particular places in
tide water. *Burnham* v. *Webster,* 5 Mass. 266. *Dunham* v.
*Lamphere,* 3 Gray, 268. *Smith* v. *Maryland,* 18 How. 71. *Corfield* v. *Coryell,* 4 Wash. C. C. 371, 380. *Bennett* v. *Boggs,* Bald.
60. In those waters, whether within or beyond the ebb and flow
of the tide, which are not navigable from the sea for any useful
purpose, there can be no restriction upon its authority to regulate
the public right of fishing, or to make any grants of exclusive
rights which do not impair other private rights already vested.
*Nickerson* v. *Brackett,* 10 Mass. 212. *Cleaveland* v. *Norton,* 6
Cush. 380. *Russell* v. *Russell,* 15 Gray, 159, 161.

The term " navigable waters," as commonly used in the law,
has three distinct meanings : 1st, as synonymous with " tide waters," being waters, whether salt or fresh, wherever the ebb and
flow of the tide from the sea is felt; or, 2d, as limited to tide
waters which are capable of being navigated for some useful purpose ; or, 3d, (which has not prevailed in this Commonwealth)
as including all waters, whether within or beyond the ebb and
flow of the tide, which can be used for navigation. *Commonwealth* v. *Chapin,* 5 Pick. 199. *Rowe* v. *Granite Bridge Co.*
21 Pick. 344. *Murdock* v. *Stickney,* 8 Cush. 113, 115. *Attorney
General* v. *Woods, ante,* 436. *Waters* v. *Lilley,* 4 Pick. 145, 147.
*Genesee Chief* v. *Fitzhugh,* 12 How. 443. *The Daniel Ball,* 10
Wallace. 557.

The object of the St. of 1869, *c.* 384, is declared by its title to be "encouraging the cultivation of useful fishes," and its principaı provisions, so far as they have any bearing upon this case, are as follows:

" For the purposes of this act," it expressly adopts, as to streams at least, the second of the definitions just stated, and gives it additional precision, by providing, in § 14, that " no tidal stream shall be considered navigable above the point where on the average throughout the year it has a channel less than forty feet wide and four feet deep during the three hours nearest the hour of high tide," and, in § 17, that the governor and council may " arbitrarily fix and determine the tidal bounds and mouths of streams, upon the recommendation of the commissioners on inland fisheries." It further provides, in § 15, that the governor and council, upon the like recommendation, " may limit or prohibit, for a period not exceeding five years at a time, fishing in the navigable tidal waters of specified streams, and in the unnavigable waters of streams, except in such portions as may be inclosed according to the provisions of section sixteen," by which section " any riparian proprietor may, within the limits of his own premises, inclose the waters of a stream not navigable, for the cultivation of useful fishes; provided he furnishes a suitable passage for migratory fishes naturally frequenting such waters."

Section 7 provides that " the riparian proprietors of any pond, the superficial area of which is not more than twenty acres, and the proprietors of any pond or parts of a pond, created by artificial flowage, shall have exclusive control of the fisheries therein existing; but this shall not abridge any rights, heretofore granted, to fish for herring or alewives in ponds of the above dimensions which are connected with salt water, nor affect any previous laws restricting fishing for any period of time." And by § 13, if any such pond is bounded in part by land belonging to a town, or a county, provision is made for the assessment and payment of compensation for its rights therein.

By § 8, " the fishery of any pond, the superficial area of which is more than twenty acres, shall be public, except such as may have been specially granted by law or leased as hereinafter pro-

vided, and all persons shall, for the purpose of fishing, be allowed reasonable means of access to the same, without rendering themselves liable to prosecution or action for trespass." By § 9, "the commissioners, or any two of them, may, in the name of the Commonwealth, lease any great pond, exceeding twenty acres in area, for the purpose of cultivating useful fishes, for such periods of time and on such terms and conditions as shall seem to said commissioners most for the public good ; and the lessee of such pond may occupy a portion, not exceeding one tenth part thereof, with inclosures and appliances for the cultivation of useful fishes ; but this shall not affect any public rights in such pond, other than the right of fisheries ; and the appliances and inclosures used by the lessee shall be so placed as not to debar ingress to or egress from such pond at proper places." And by § 10, "the commissioners shall have the custody of all leases made under the provisions of this act, and may cause any agreements, rights, reservations, forfeitures and conditions therein contained to be enforced, and for that purpose may institute proceedings in the name of the Commonwealth, and may take possession of any premises for conditions in such lease thereof being broken, and, revesting the Commonwealth therewith, may again lease the same."

By § 18, "fishes artificially propagated or maintained shall be the absolute property of the person propagating or maintaining them." And by § 19, "whoever fishes in that portion of a pond, stream or other water in which fishes are lawfully artificially cultivated or maintained, without the permission of the proprietors," shall be subject to a penalty. It is upon this section that the present complaint is founded.

The defendant contends that the Tisbury Great Pond is within the ebb and flow of the tide, and therefore not within the purview of the statute. It is true that most of the great ponds which have heretofore been the subject of judicial decision have been above the ebb and flow of the tide. *Cummings* v. *Barrett*, 10 Cush. 186. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Berry* v. *Raddin*, 11 Allen, 577. And if this pond had been accessible in vessels or boats from the sea, there would be great force in the objection that the legislature could not have intended by this

statute to put it so far under the control of the commissioners on inland fisheries as to authorize them to lease it. But many or the great ponds of the Commonwealth have a more or less direct communication with salt water, as is recognized in § 7 of this very statute above quoted. See also *Tudor* v. *Cambridge Water Works*, 1 Allen, 164. And it appears by the facts stated in the report that this pond is not connected with the sea except by a narrow channel, partly natural and partly artificial, not suited to any other use than the passage of fish, not always sufficient for that purpose without being artificially cleared, and not a navigable stream within the definition of the statute itself. The court is of opinion that such a pond is a great pond, within the meaning of the statute, of which, as it exceeds twenty acres in extent, the commissioners may make a lease.

It is next contended that the statute does not apply to migratory fish, which come and go from the pond to the sea. But many provisions of the statute show that it is not to be so limited in its application. Section 1 declares that "all the laws of the Commonwealth, relating to the culture, preservation, capture or passage of fish, shall be known as the laws relating to inland fisheries." The commissioners on inland fisheries are authorized by § 3 to enforce all laws regulating inland fisheries, and to seize and remove illegal obstructions, except mill dams, "to the passage of migratory fish;" and by § 4 to compel the construction and improvement of fishways, which can only be required for migratory fish. The only restriction imposed by § 16 upon the right of any riparian proprietor to inclose within the limits of his own premises the waters of a stream not navigable, for the cultivation of useful fishes, is that he must provide a suitable passage for "migratory fishes naturally frequenting such waters." And the statute contains many specific provisions regarding fishes that go annually to the sea, such as alewives, shad, salmon, trout and smelt. §§ 7, 23, 24, 26–29, 31. The general words of § 9, authorizing leases of great ponds of more than twenty acres "for the cultivation of useful fishes," and of § 19, for the punishment of "whoever fishes" without permission of the proprietors where "fishes are lawfully artificially cultivated or maintained," must

therefore be taken to include all kinds of fish, whether migratory or not.

It is next argued that this complaint cannot be supported, because, when the defendant took fish as alleged, the lessees had in fact introduced no new fish into the pond, nor fed the fish already there, nor erected any fish-houses, appliances or inclosures, nor put up any notices to prohibit persons from fishing, nor done anything towards cultivating, propagating or maintaining the fish, except to clear the passage to the sea. But we are of opinion that, upon the fair and reasonable construction of the statute, a pond which has been leased by the commissioners for the cultivation of useful fishes under § 9, and thereby set apart and held for that purpose, and the occupation of which has not been abandoned by the lessees, is a place " in which fishes are lawfully artificially cultivated or maintained," within the meaning of the statute, and that the question whether any special means should be taken by the lessees to carry out the object of the lease is one to be determined by the commissioners in framing the lease under § 9 and in enforcing breaches of agreements and conditions therein under § 10, and not to be raised by a person fishing without authority.

The objection that the exclusive right of the lessees to the fish in the pond was limited to one tenth part of the pond is inconsistent with the express terms of the statute. Section 9 authorizes the whole pond to be leased for the cultivation of useful fishes, subject only to the restrictions that the appliances and inclosures for the purpose shall not occupy more than one tenth part of the pond, and shall be so placed as not to debar reasonable ingress to and egress from it, and that any public right in the pond, other than the right of fishing, shall not be affected. The reason for the terms of the prohibition of § 19 against fishing " in that portion of a pond, stream or other water in which fishes are lawfully artificially cultivated or maintained," evidently was that fishes might lawfully be cultivated or maintained by the proprietors of part of a pond created by artificial flowage, under § 7, or by the proprietors of part of a stream not navigable under § 16.

The remaining objections made are to the form of the lease. One is, that it contemplates the occupation of one tenth part of the pond with appliances and inclosures " for the taking," as well as the cultivation of fish by the lessees. But § 20 provides " that any person lawfully engaged in the artificial culture and maintenance of fishes may take them in his own waters how and when he pleases ; " and the terms of the lease in this respect were within the discretionary authority of the commissioners under § 9. The other is, that it only requires the lessees so to arrange their inclosures and appliances as not to debar ingress and egress at proper places " at proper times " and not at all times. But this only affirms what would otherwise have been implied, for the statute could not be construed to secure a right of ingress and egress at unreasonable times.

The result is, that none of the grounds of defence can be sustained, and there must be *Judgment on the verdict.*