COMMONWEALTH *vs.* RICHARD E. FOLLETT.

Berkshire. September 10, 1895. — October 19, 1895.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Taking of Trout with a Net — Statute.*

The provisions of Pub. Sts. c. 91, § 51, are intended to prohibit an owner of land on a stream not navigable from taking trout with a net from the stream on his own land, as well as to prohibit other persons from doing so.

Trout are not a class of animals which can become the absolute property of anybody while in an open unenclosed stream.

COMPLAINT charging that the defendant, on September 1, 1893, caught and took three hundred trout from the waters of

" Lee Brook," so called, in Sheffield, with and by means of a certain net.

Trial in the Superior Court, before *Maynard,* J., who allowed a bill of exceptions in substance as follows.

The stream from which the trout were taken was a brook made up of two or three tributaries, having its source in the town of Sheffield and known as Lee Brook. It flowed some three or four miles, to a stream known as Hubbard Brook, through which its waters discharged into the Housatonic River, all in the town of Sheffield. None of these streams were navigable.

The principal tributary to Lee Brook flowed about half a mile and entered land owned or leased by the defendant, there uniting with another tributary having two sources on the land of the defendant, one a spring upon which his hatchery was situated, and the other a spring the water from which flowed about half a mile and united with the stream flowing from the hatchery spring a short distance below. On the tributary thus formed, and before its union with said principal tributary, the defendant had erected a number of small dams forming artificial ponds in which he kept trout for culture. This brook thus made up flowed from the land so owned or leased by the defendant to and through land of another riparian proprietor, the distance on the last named land being about half a mile, and then entered again upon other land owned or leased by the defendant, through which it flowed about one mile and entered the land of another riparian proprietor. There were no obstructions in either of said brooks to interfere with the passage of fish up and down the stream, except the dams erected by the defendant, as stated, upon the tributary having its sources upon his land, and the vats and tanks erected upon the same tributary in connection with the defendant's hatchery, and there were trout in Lee Brook other than those which the defendant claimed to be owned by him, it having been on one or two occasions stocked by other parties, within two or three years before the erection of the defendant's hatchery.

The defendant testified that he was engaged in the business of artificially propagating and maintaining trout in Sheffield; that he had a trout hatchery, so called, on a small tributary of Lee Brook in Sheffield, where he artificially hatched nearly

three millions of " fry," or young trout, yearly; that he owned or leased land through which a portion of Lee Brook flowed, as above stated; that the sources of the small tributary brook which emptied into Lee Brook were in land so owned or leased by him, one of which was the spring within his hatchery building and the other the spring outside of said building, which the defendant had dug out and made into a series of small artificial ponds, wherein he kept trout artificially propagated or maintained by him in his said business; that the overflow from the hatchery and from the pond united, forming said small tributary of Lee Brook which flowed through the land owned or leased by the defendant, and to and through land of other riparian proprietors, finally emptying into a larger brook called the Hubbard Brook; that early in 1893 he purchased in Rhode Island fifteen hundred artificially propagated trout of the species called " Hoxie trout," for the purpose of obtaining their spawn for use in his business; that they were two years old and weighed on the average about half a pound each; that he brought them from Rhode Island and placed them in one of the artificial ponds; that in the following June, 1893, he noticed that they were becoming diseased, a fungus growth appearing on their fins and sides; that to check this disease he let them out of the pond into Lee Brook, on the land owned or leased by him; that on all the land so owned or leased by him through which the brook flowed were printed notices stuck up forbidding persons from fishing in the brook on the defendant's premises; that afterwards he fed the trout in the brook on those sections thereof which flowed through land so owned or leased by him by throwing chopped meat and other substances into the water, a portion of which floated down the stream with the current; that they were fed by him daily in the same manner as he fed those in the hatchway; that in the latter part of August or early part of September of the same year, to secure some of the spawn from the trout for use in his business of trout culture, he caught from the brook on his own premises, both on the land where his hatchery was located below the hatchery and on his lands below the half-mile strip of the intervening riparian proprietor, a number of trout, estimated at sixty, with a net; that nearly all of them were Hoxie trout, being a part of the number let into the

brook by him the June before; that they were very tame, easily netted and readily identified as the Hoxie trout; that he placed them when caught in his hatchery, kept them there until ripe, that is, until they were ready to be delivered of their spawn, some three or four weeks, then stripped the spawn from them and let them all back into the brook; and that all the fish so taken other than the Hoxie trout were thrown from the net back into the brook.

The defendant also called witnesses who claimed to be experts in trout culture, who testified that Hoxie trout could easily be distinguished from the ordinary brook trout. There was also evidence from the witnesses on both sides that the native or ordinary brook trout were of a deeper and richer shade than the Hoxie and other trout artificially propagated, but that after remaining in the brook for a period of time the latter came to look more like the native trout.

The judge stated that he should instruct the jury in regard to the Hoxie trout, " that if the defendant took the fish in a net in the manner and in that portion of the brook testified to by him, and took them away and kept them till ripe and then stripped them, as testified to by him, he was guilty of a violation of the statutes upon which the complaint is founded, although he was able and did identify each fish so taken and taken away as a fish which he had brought from Rhode Island and let loose in said brook, as testified to by him, and although he returned each of said fish to said brook as soon as stripped."

In view thereof, the defendant consented that the judge might direct a verdict of guilty; and the defendant alleged exceptions.

*H. C. Joyner,* (*C. E. Hibbard* with him,) for the defendant.

*C. L. Gardner,* District Attorney, for the Commonwealth.

FIELD, C. J.    The Pub. Sts. c. 91, § 51, prohibit the taking of trout with a net at any season of the year.   Sections 25 and 26 of the same chapter are as follows: " Sect. 25.   A riparian proprietor may, within the limits of his own premises, enclose the waters of a stream not navigable, for the cultivation of useful fishes : provided he furnishes a suitable passage for migratory fishes naturally frequenting such waters.   Sect. 26.   Fishes artificially propagated or maintained shall be the property of ·the person propagating or maintaining them; and a person legally

engaged in their culture and maintenance may take them in his own waters at pleasure, and may have them in his possession for purposes properly connected with said culture and maintenance, and may at all times sell them for these purposes, but shall not sell them for food at seasons when their capture is prohibited by law."

The construction we give to these sections, when applied to fish in the waters of a stream not navigable, is that the fish which are declared to be the property of the person propagating or maintaining them, and which such person may take "in his own waters at pleasure," are fish in waters which have been enclosed as provided by § 25. In *Commonwealth* v. *Perley*, 130 Mass. 469, 471, the court (speaking of St. 1869, c. 384, §§ 16, 18, and 20 of which were incorporated in §§ 25 and 26 of c. 91 of the Public Statutes) say: " The absolute ownership created by the statute necessarily exists only where and so long as he who propagates or cultivates the fish keeps them within a territory over which he has absolute control; as soon as he permits them to pass into territory where others have rights of fishery, equal to or greater than his, his ownership is gone, because they may then be rightfully taken by others without his consent," etc.

The contention of the defendant, that the Hoxie trout had become so tame as to become his absolute property wherever they might be found in an open stream, cannot be supported. Such fish are not of the class of animals which, without confining them in private waters, can become the absolute property of anybody. These trout in an open stream are like other trout, and Pub. Sts. c. 91, § 51, were intended to prohibit an owner of land on a stream not navigable from taking trout with a net from the stream on his own land, as well as to prohibit other persons from doing so.

*Exceptions overruled.*