INHABITANTS OF LYNNFIELD *vs.* INHABITANTS OF PEABODY.

DAVID P. IVES (afterwards SARAH S. IVES and later the administratrix of her estate with the will annexed) *vs.* SAME.

ARTHUR W. MANSFIELD (afterwards the administrators of his estate) & another *vs.* SAME.

HELEN M. MARSH *vs.* SAME.

GEORGE S. SILSBEE (afterwards the executrix of his will) *vs.* SAME.

Essex.   November 5, 6, 1914. — November 24, 1914.

Present: RUGG, C. J., HAMMOND, SHELDON, DE COURCY, & CROSBY, JJ.

*Great Pond. Water Supply. Humphrey's Pond. Evidence,* Ancient deeds, Chalks and plans. *Boundary. Practice, Civil,* Auditor. *Eminent Domain,* Taking. *Damages,* For the taking of waters. *Municipal Corporations. Parks. Lynnfield.*

By a grant of the General Court to "John Humfry" on May 6, 1635, before the Colony ordinance of 1641-47, of "500 acres of land & a freshe pond, with a little ileland conteyneing aboute two acres," subject to a right of the towns of Saugus and Salem "to build stoore howses vpon the said ileland, & to lay in such pvisions as they iudge necessary for their vse in tyme of neede," Humphrey acquired as private property both the five hundred acres of land and the great pond with the island therein, which now is called Humphrey's Pond

and sometimes Suntaug Lake; but the grant, having been a gratuitous one, is to be construed strictly, and, there having been no express grant of the waters, Humphrey, although he took the pond, acquired no interest, except as a riparian proprietor, in the stream which formed its outlet.

Although John Humphrey under the grant from the General Court in 1635 owned the bed of Humphrey's Pond and had the right to have the water remain in the bed so as to preserve it as a pond, he had no absolute ownership in the water but only the right to use it as a riparian proprietor; and consequently, those claiming under Humphrey, upon a petition under St. 1881, c. 171, §§ 3, 6, to recover damages for the taking of the waters of Humphrey's Pond by the town of Peabody for an additional water supply, although they may recover for damages to their property by the taking of the pond, can recover no damages based on the value of the pond as a water supply, because they had no right to sell the water for that purpose.

The title to real estate of a predecessor in title of a petitioner for damages, which was acquired by a levy of execution, may be proved by a recital in an ancient deed in the chain of title made by such predecessor in title, from the language of which such a levy of execution may be inferred.

Where those having the title of one, who by a grant from the General Court before the Colony ordinance of 1641–47 owned the land surrounding a great pond and the bed of the pond and riparian rights in its waters, gave deeds of parcels of the land bounded "by the pond," or with a boundary described as "running by the pond" or to some monument on the edge of the pond and thence along or by the pond, there being no apparent motive for any of the grantors to retain their title to the bed of the pond or their rights in its waters after parting with their upland, the title passed to the centre of the pond where the grantor's ownership extended so far.

Other deeds, however, of owners having a like title, which described the premises conveyed as running "to the edge of the pond" and as being bounded "on the edge of the pond," in the absence of any other mention of the pond or of rights in its waters or any statement showing a broader intent, passed title only to the low water mark of the pond.

Where a petition for the assessment of damages was referred to an auditor "to hear the parties and their evidence and find the facts and report the same to the court, together with such rulings and questions of law as either party may request," if the auditor has made what he calls a "finding," which appears to have been a ruling of law rather than a finding of fact and to have been erroneous, it will be disregarded.

St. 1881, c. 171, § 3, authorized the town of Peabody to take the waters of Humphrey's Pond for an additional water supply. Section 5 of the same chapter required the town "within sixty days after the taking of any land" under the act to file a description thereof in the registry of deeds. The town took the waters of the pond by inserting an intake pipe ten feet below the high water mark of the pond. *Held,* that the taking was a valid one, the filing of a description of the property taken being required only in case of a taking of land, and that consequently damages for the taking must be assessed upon the basis that the town took the waters of the pond to the level of the pipe and no more.

Upon a petition for the assessment of damages for the taking by a town under statutory authority of the waters of a pond for an additional water supply, although the town under its taking can draw from the pond only so much water

as may be required for the wants of the town, present and future, yet a petitioner who is deprived of a right to use the waters of the pond is entitled to have his damages assessed according to the taking of the waters that has been made.

Where a town under statutory authority has taken the waters of a great pond as a source of water supply, it does not become the absolute owner of the waters of the pond or entitled to use them for any other purposes than those stated in the statute that authorized the taking, and all public and private rights not inconsistent with the new and limited right acquired by the town remain as before.

At the trial of petitions by the several owners of portions of the bed of a great pond and of the right to use its waters as riparian proprietors, against a town, for the assessment of damages for taking the waters of the pond under statutory authority as a source of water supply, a plan, which is used as a chalk to show the claims of the several petitioners, although it may be permitted to be used for this purpose, is not competent evidence of the property of each petitioner in the bed of the pond, which it purports to show.

On petitions under St. 1881, c. 171, §§ 3, 6, by the several owners of portions of the bed of Humphrey's Pond and of the right to use its waters as riparian proprietors, for the assessment of damages sustained from the taking of the waters of the pond by the town of Peabody as an addition to its water supply, where § 5 of the statute required that the town "within sixty days after the taking of any land" under the statute should file a description thereof in the registry of deeds, and the town had filed no description of any land taken but had made an actual taking of the waters by inserting an intake pipe ten feet below the high water mark of the pond, it was *held*, that an instruction of the presiding judge that the town had taken an easement in the bed of the pond, which permitted the jury to give damages for such a taking, was erroneous, because no taking was made of any interest in the land and the easement to have the water supported by the bed of the pond remained unaffected by the taking.

Under R. L. c. 28, § 2, a town has the right to take for park purposes land covered by water and rights in the water as well as upland.

The town of Lynnfield under R. L. c. 28, § 2, took for park purposes land upon Humphrey's Pond, which was described in the instrument of taking as bounded "northerly and easterly by Suntaug Lake, also called Humphrey's Pond." *Held*, that the town acquired by the taking the same title in the bed of Humphrey's Pond and the same right to use the waters of the pond that belonged to the owners of the land taken by it.

FIVE PETITIONS, filed in the Superior Court, the first on May 29, 1906, and the other four on May 4, 1907, under St. 1881, c. 171, §§ 3, 6, for the assessment of damages sustained by the respective petitioners from the taking by the town of Peabody of the waters of Humphrey's Pond, otherwise known as Suntaug Lake, a natural great pond partly in the town of Peabody and partly in the town of Lynnfield having an area of about one hundred and fifty-four acres, for an addition to the water sup-

ply of the respondent, the waters of the pond first having been diverted by the respondent on December 19, 1905.

In the Superior Court the cases were referred to James H. Sisk, Esquire, as auditor, "to hear the parties and their evidence and find the facts and report the same to the court, together with such rulings and questions of law as either party may request, and such portions of the evidence as either party may request." In each of the cases the auditor found for the respondent. Later the cases were tried together before *King,* J., upon the auditor's report and oral evidence. The witness Danforth, mentioned in the opinion, was an old resident of Lynnfield, who formerly had owned a part of the Humphrey grant.

In regard to the title of Saltonstall, through whom the petitioners claimed title to their several properties, the master made the following finding: "The title from John Humphrey passed to Robert Saltonstall by virtue of an execution that Saltonstall obtained against Humphrey. The execution was not introduced in evidence, but reference to it is found in the recital in the deed from Saltonstall to Winthrop. Robert Saltonstall conveyed to Stephen Winthrop, 1645," by a deed in which the description of the property conveyed contained the following language: "A certain farm called Ponds Farm, together with the buildings thereon and all meadows and other appurtenances thereto belonging according to the limits set by the Court in their grant to Mr. Humfry . . . which lands were delivered to Mr. Saltonstall by execution according to judgment of Court, 6–10–1642, as also the great pond itself."

At the close of the evidence the respondent renewed a motion, previously made, that the testimony of the petitioners' expert witnesses giving the value of Humphrey's Pond as a water supply be stricken from the record. The judge denied the motion. The judge refused to order verdicts for the respondent, and also refused many requests of the respondent for rulings, granting others. At the request of the petitioners the judge made the following rulings:

"1. The grant to 'John Humfry' in 1635 vested this pond as private property in Humphrey.

"2. The Ordinance of 1641–47 does not apply to the pond."

"10. The general rule of construction of all grants of land

bounded by water of any kind is now well established, that, unless qualified by restrictive words, they pass the soil towards the centre of the water as far as the grantor owns, or to the centre of the pond."

"12.  In a conveyance of land bounded on water, the water and the land under the water will go as appurtenant to the upland to the middle of the pond or stream."

"17.  Besides damage for the value of the water taken, the petitioners, if entitled, are entitled to any damage resulting to the upland by the taking of the waters."

"24.  The petitioners are entitled to compensation for such damages as have resulted to the upland for the taking of the waters of this pond."

To each of these rulings the respondent excepted.

The judge at the conclusion of his charge submitted to the jury the following specific questions:

"1.  Has there been any period of time, since 1635, when the successors in interest of John Humphrey, or the predecessors in title of the petitioners, abandoned or relinquished (by concurring acts and intent) all their special rights, title and interest in Humphrey's Pond, including the waters thereof and the soil thereunder?

"If the jury answer yes to the foregoing question, then say when, and for what period.

"2.  Has there been any period of time between 1635 and the time when the dispute arose, resulting in the present litigation, when the public and all parties in interest in Humphrey's Pond acquiesced in treating it as a great pond, or a pond owned by or subject to the rights therein of the public?

"If this question is answered in the affirmative, say when this period was, and approximately how long it continued.

"3.  Has the public since the original grant to John Humphrey in 1635 of Humphrey's Pond, and down to the time when the dispute arose resulting in this litigation, gained by adverse use or by prescription, such rights, or any thereof, as the public have in great ponds under the ordinance of 1641-7?"

The jury answered "No" to each of the three questions thus submitted.

In each of the cases the jury returned a verdict for the peti-

tioner, awarding damages as follows: To the town of Lynn-
field, $10,009.68; to the administratrix of the estate of Sarah S.
Ives, $9,869.86; to the administrators of the estate of Arthur W.
Mansfield, and another, $6,345.44; to Helen M. Marsh, $4,503.22;
and to the executrix of the will of George S. Silsbee, $45,170.79.

The respondent alleged exceptions.

The grant to "John Humfry" as printed on page 147 of Vol-
ume 1 of the Records of Massachusetts, was as follows:

"May 6, 1635. There is 500 acres of land & a freshe pond, with
a little ileland conteyneing aboute two acres, graunted to John
Humfry, Esqr, lyeing betwixte nore & west from Saugus, pvided
hee take noe p͠te of the 500 acres within 5 myles of any towne
nowe planted. Also, it is agreed, that the inhabitants of Saugus
& Salem shall have liberty to build stoore howses vpon the said
ileland, & to lay in such pvisions as they iudge necessary for
their vse in tyme of neede."

The portion of the Colony ordinance of 1641–47, relating to
great ponds, is as follows: "Every inhabitant who is an house-
holder shall have free fishing and fowling in any great ponds . . .
unless the freemen of the same town, or the general court have
otherwise appropriated them. Provided, that no town shall ap-
propriate to any particular person or persons, any great pond,
containing more than ten acres of land. . . . And for great ponds
lying in common, though within the bounds of some town, it shall
be free for any man to fish and fowl there, and may pass and
repass on foot through any man's propriety for that end, so they
trespass not upon any man's corn or meadow." Anc. Chart. 148.

Section 5 of St. 1881, c. 171, referred to in the opinion, is as
follows: "Said town of Peabody, within sixty days after the
taking of any land as aforesaid, shall file in the registry of deeds
for the southern district of the county of Essex a description
thereof sufficiently accurate for identification, and the title of
all land so taken shall vest in said town."

*B. N. Johnson,* (*H. F. Knight & J. J. Sheehan* with him,)
for the respondent.

*S. Parsons,* (*H. A. Bowen & C. D. C. Moore* with him,) for the
town of Lynnfield.

*D. N. Crowley,* (*G. C. Donaldson* with him,) for the other peti-
tioners.

SHELDON, J. Each one of these petitioners claims to hold title under the grant made on May 6, 1635, by the General Court to "John Humfry" of "500 acres of land & a freshe pond, with a little ileland conteyneing aboute two acres." This grant has been alluded to several times in our reports. Reporter's note to *Commonwealth* v. *Roxbury*, 9 Gray, 451, at page 528. *West Roxbury* v. *Stoddard*, 7 Allen, 158, 165. *Commonwealth* v. *Vincent*, 108 Mass. 441, 446. *Watuppa Reservoir Co.* v. *Fall River*, 147 Mass. 548, 554. It is undisputed that the pond thus granted to Humphrey, the name of which is still Humphrey's Pond, though it is sometimes called Suntaug Lake, is the same pond which has been taken by the respondent and for the taking of whose waters these proceedings are brought. Each of the petitioners has been allowed to recover damages upon the ground that they were respectively owners, not only of the soil under the pond, but of the water contained therein, with the right to use and deal in the same as a commodity, and even, if they should choose to do so, to sell the water as a source of water supply to any water company, town or city, that might have the right to make such a purchase, because, as they contend, the grant to Humphrey vested in him, as private property, both the five hundred acres of land and the pond, including the soil and the waters thereof. The respondent contends that Humphrey acquired no title to the waters of the pond itself, because, in the first place, the language of the grant, properly construed, did not include those waters within its subject matter, and because, secondly, if the pond was included within the property intended to be conveyed, the attempted grant of the pond was inconsistent with the trust for the people upon which it was held under the Colony charter, and was merely void.

The latter contention has been put very strongly in argument; but in our opinion it cannot be sustained. On the natural meaning of the language, it is plain that it was intended to pass the pond as well as the five hundred acres of land. "Ordinarily a grant of a pond as a piece of real estate would include the entire area within its borders." *Attorney General* v. *Herrick*, 190 Mass. 307, 313. Nor is the validity of the grant now an open question. As already stated, it repeatedly has been alluded to in our decisions and its validity always has been as-

sumed. In the learned note of Mr. Justice Gray, cited above, it was said (page 528): "Great ponds were not at first reserved as public property, or lying in common." This was recognized as having been the law of Massachusetts in *Concord Manuf. Co.* v. *Robertson*, 66 N. H. 1, 24. The validity of such a grant of the flats lying between Boston and Dorchester was assumed in *Commonwealth* v. *Roxbury*, 9 Gray, 451, though it was held that the grant did not cover all that was contended for. In *Berry* v. *Raddin*, 11 Allen, 577, it was held that a grant by the town of Lynn of the use of the water of a stream flowing from a great pond and of the right to make sluices and to build a dam at the head of the stream, in order to create a head of water, made before the ordinance of 1641–47, and before any of the land bordering on the stream had been granted to others, created a good title in the grantee. In *Watuppa Reservoir Co.* v. *Fall River*, 154 Mass. 305, the Pocasset grant made by Plymouth Colony to certain individuals for a valuable consideration, in 1680, was upheld, and it was decided that all the subject matter of the grant, including the lands, the waters, and the great ponds lying in the described territory, vested in the grantees thereof as private property, because the Massachusetts ordinance of 1641–47 had not then become binding in Plymouth Colony. Accordingly, upon proof of the grant and of the rights thereunder of the parties to the litigation, a different result was reached from that which had been declared in the previous decision reported in 147 Mass. 548. Again, in *Attorney General* v. *Ellis*, 198 Mass. 91, the decision went upon the ground that the great pond there in question had become the private property of John Haynes, by virtue of a grant made to him by the Court of Assistants in 1634, but that since then the title had become vested in the Commonwealth by prescription. And the weight of authority is that under the original rule of the common law, and before the common law of Massachusetts was declared by the Colony ordinance to be otherwise for the future, ponds like this might by a proper grant be made the subject of private property. *Hardin* v. *Jordan*, 140 U. S. 371. *Kean* v. *Calumet Canal & Improvement Co.* 190 U. S. 452. *Wilton* v. *Van Hessen*, 249 Ill. 182. *Ridgway* v. *Ludlow*, 58 Ind. 248. *Clute* v. *Fisher*, 65 Mich. 48. *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.* 102 Mich. 227.

*Deuterman* v. *Gainsborg,* 41 N. Y. Supp. 185, 186.   *State* v. *West Tennessee Land Co.* 158 S. W. Rep. 746.   *Bristow* v. *Cormican,* 3 App. Cas. 641.   *Mackenzie* v. *Bankes,* 3 App. Cas. 1324, 1338.   *Johnston* v. *O'Neill,* [1911] A. C. 552.

We feel obliged to say that Humphrey, by the grant made to him in 1635, acquired title to this great pond as private property.

Many other decisions in different jurisdictions bearing more or less directly upon this question have been brought to our attention by the industry of counsel.   But we have not found these of much assistance.   In Maine and New Hampshire the rule of our Colony ordinance is regarded as a part of the common law originally adopted in those States.   *Conant* v. *Jordan,* 107 Maine, 227. *Concord Manuf. Co.* v. *Robertson,* 66 N. H. 1.   *State* v. *Welch,* 66 N. H. 178.   It is believed that there is no other jurisdiction in which the first statement of the rule adopted as to private rights of property in inland waters or the land under them has been accompanied by a declaration that the rule established was not to be applied to grants preceding such establishment.   But that was the statement of the Colony ordinance of 1641–47: "Unless the freemen of the same town or the general court have otherwise appropriated them."

This grant then passed to Humphrey both the five hundred acres of land and the pond, with the island therein.   But the grant, made to one of the first settlers, does not purport and has not been shown to have been given for any valuable consideration.   No money was paid, no services had been or were to be rendered in return for it, as was the case in *Berry* v. *Raddin,* 11 Allen, 577.   It comes therefore within the principle applicable to such cases, that though the words used are to be given their natural and ordinary meaning, yet where those words are ambiguous or there is doubt as to the scope or extent of the subject matter of the grant, the construction adopted must be the one most favorable to the grantor and most restrictive of the rights passing by the grant.   *Cleaveland* v. *Norton,* 6 Cush. 380, 383, 384.   *Commonwealth* v. *Roxbury,* 9 Gray, 451, 492, 493. This grant was merely of the fresh pond and the island therein. No mention was made of the water of the pond or of its tributaries or outlet as part of what was granted.   By the common law as

recognized here, the owners of lands upon those tributaries, if any, or upon the stream which formed the outlet of the pond had valuable riparian rights in the waters thereof. It does not appear, as it did in *Berry* v. *Raddin*, 11 Allen, 577, that it was intended to take away or abridge those rights in favor of Humphrey. No privileges were given to him, either expressly or by necessary implication, which would interfere with the exercise by such other proprietors of their riparian rights. Such interference could not be justified without a clear expression of the will of the sovereign authority. *Treat* v. *Lord*, 42 Maine, 552. That doctrine was declared by this court in a stronger case than this. *Watuppa Reservoir Co.* v. *Fall River*, 147 Mass. 548; 154 Mass. 305. The Pocasset grant which there was finally sustained enumerated in the habendum "all and singular the woods, waters, coves, creeks, ponds, brooks, benefits, profits, privileges, and hereditaments whatsoever." It was contended that because mentioned only in the habendum and not in the granting clause great ponds and the waters thereof did not pass by the grant. But the court held otherwise, and said (154 Mass. 306, 307): "No such technical argument can be allowed to prevail against the plain meaning of one of our early deeds. . . . In the conveyances made early after the settlement of the country, artificial rules yield to the intention to be gathered from the four corners of the instrument, *propter inopiam consilii.*" In the case at bar, there is not, as there was in the Watuppa Reservoir case, either a valuable consideration or an express grant of the "waters." Humphrey took merely the pond, and acquired no interest (except as a riparian owner) in the stream which formed its outlet. With reference to such a state of affairs, it was intimated in the majority opinion in the first hearing of the Watuppa case (147 Mass. 548, 554) and agreed to in the dissenting opinion (page 562) that the individual owner of a pond like this, not being the owner also of the stream flowing from it, could not fill up the pond or divert the waters by artificial conduits or channels, to the injury of the riparian owners upon that stream. And the court added: "Where lands border upon a natural stream, each of the proprietors owns the fee to the thread of the stream, and has a right to the natural flow of the stream, subject to the right of every other proprietor to make such use of the water as it passes through his land as

is not unreasonably injurious to all the others who with himself have a common right in the stream. Each proprietor has the right to the benefit of it as it passes through his land for all the useful purposes to which it may be applied, and no proprietor above or below has the right unreasonably to divert, obstruct, or pollute it." The cases cited by the court fully sustain these propositions, if indeed they needed any support, and we are not aware of any respectable authorities to the contrary. Certainly nothing in the later decision in 154 Mass. 305 is at variance with them.

Property in the water of a flowing stream, or in any large pond or lake which has a flowing stream for its outlet, is at best of a precarious nature. Such water is hardly susceptible of absolute ownership or of any other than a usufructuary right, capable of enforcement and enjoyment only while it remains within the domain of its possessor. See the cases collected in 40 Cyc. 552. In this respect such water resembles the unconfined fish which swim therein. *Commonwealth* v. *Follett*, 164 Mass. 477, 481. It was the use of the water which was protected in *Berry* v. *Raddin,* 11 Allen, 577, *Watuppa Reservoir Co.* v. *Fall River*, 154 Mass. 305, and similar cases. It was the use of the water which was regulated by the Colony ordinance. *West Roxbury* v. *Stoddard*, 7 Allen, 158. *Attorney General* v. *Woods*, 108 Mass. 436. *Hittinger* v. *Eames*, 121 Mass. 539.

The rights of owners of great ponds to the waters thereof were stated again by this court in *Proprietors of Mills on Monatiquot River* v. *Commonwealth*, 164 Mass. 227, 229. There the title to a great pond had become vested in the Commonwealth by a taking, just as it had in Humphrey by the grant to him; and the questions raised in the case called upon the court to determine what rights in the water had passed to the Commonwealth as a private owner, as distinguished from the rights which, before the taking, it held in the pond. And the court said: "Land and rights in land have been taken, and this includes ponds and streams of water within the limits of the land taken, but no right is given to divert running water from the channels in which it naturally flows. The Commonwealth, as owner in fee after the taking, has, we think, the rights which belong to a private owner of land and of ponds and streams on the land. The Commonwealth was the

owner of the great pond before the taking, and its rights to control the waters of this pond are either the same as they were before the taking, or have been made somewhat less by the taking. The land has been taken for and the pond has been taken for or dedicated to the purposes of the statute. . . . The Commonwealth, succeeding to the title of private owners, acting through the board of commissioners, may make such reasonable use of the waters on the land taken as the private owners before the taking lawfully could have made without liability to the owners of land not taken, but to or through whose land these waters flow. Whether the Commonwealth, as owner, has greater rights in the waters of the great pond before they issue from the pond need not now be considered." And the doctrine accordingly was affirmed that the Commonwealth, acting merely as a private owner and not in its sovereign capacity or under the police power, could not so divert the waters of a great pond, or so obstruct or diminish their flow through the natural stream which formed their outlet as to impair the rights of riparian proprietors upon that stream. It follows that Humphrey, by the grant to him, whatever other rights he acquired to the use of the waters of this pond while they remained upon his land, did not gain the lawful power to impair the riparian rights of those who owned or afterwards should own the land upon the stream which formed the outlet of his pond.

Another circumstance is of weight in the construction of this grant. Its concluding words were: "Also, it is agreed, that the inhabitants of Saugus & Salem shall have liberty to build stoore howses vpon the said ileland, & to lay in such pvisions as they iudge necessary for their vse in tyme of neede." Applying the rule of construction already quoted from the Watuppa Reservoir case, 154 Mass. 305, 306, 307, and giving effect to the plain meaning of the words used, this is clearly a provision that the inhabitants of Saugus and Salem may build storehouses and lay in provisions upon the island according to their judgment in case of need. This stipulation was inserted for the benefit of those inhabitants, and effect must be given to it accordingly. It may be that apprehension of peril from Indians was the immediate occasion for the stipulation; but it is not limited to such a danger. It gives a right to those inhabitants, whenever an exigency

may arise, to act according to their judgment in the erection of storehouses and the laying in of provisions. The privilege was to be exercised whenever the emergency should arise. It would not be barred by lapse of time in the absence of such emergencies or without an abandonment by its beneficiaries. Ordinary occupation by Humphrey or his successors in title is of course not a possession adverse to the beneficiaries. The privilege is a general one. We cannot say that exigencies may not arise calling for its exercise in the future. So far as appears by this record, it still remains in force as an incumbrance upon the title to the island. But besides this, it throws light upon the extent of usufructuary interest in the waters of the pond which passed by the grant. Manifestly Humphrey or those claiming under him could not permanently raise the level of that water to a substantial extent; for this would diminish the space available for the erection of storehouses; nor could he or they permanently lower that level, and thus make the island more easily accessible from the main land and therefore more exposed to the danger sought to be avoided. This is in accordance with the rule that the necessary accessories to the principal grant in a case like this must be taken to have passed as part of what expressly is granted. *Gorton-Pew Fisheries Co.* v. *Tolman,* 210 Mass. 402. It thus appears that though the soil under the water, the bed of the pond, did pass, it was not intended to give to Humphrey an absolute ownership in the water, but only the exclusive title to the ordinary riparian rights of an owner whose land bordered upon the pond, that is to say, within the limits of the pond itself, and the right to have the water remain in the bed of the pond, so as to preserve it as a pond. Humphrey did not acquire the rights which had been given by statute by the exercise of the right of eminent domain to the petitioners in *Gardner Water Co.* v. *Gardner,* 185 Mass. 190, and like cases; and that case turned upon the right to damages fixed by statute, as in *Dodge* v. *Rockport,* 199 Mass. 274.

It follows that the petitioners, so far as they have acquired the rights of Humphrey, may maintain their petitions to recover whatever damage may have been done to their estates by the act of the respondent in taking the pond, but have not the right to have those damages assessed or the value of their respective interests determined on the basis of the availability of the pond as

a source of water supply or of the value of the water for that
purpose; for the petitioners did not own the water as a market-
able commodity, and they had not the right to sell the water for
that purpose. *Commissioners of Canal Funds* v. *Kempshall,* 26
Wend. 404. *Buckingham* v. *Smith,* 10 Ohio, 288. The respond-
ent itself, if it had become the owner by purchase of all the rights
of Humphrey, could not have used the pond as a source of supply
for its waterworks. *Harding* v. *Stamford Water Co.* 41 Conn. 87.
*Howe* v. *Norman,* 13 R. I. 488. *Smith* v. *Rochester,* 92 N. Y. 463.
*Stein* v. *Burden,* 24 Ala. 130. *Emporia* v. *Soden,* 25 Kans. 588.
*Wilts & Berks Canal Navigation Co.* v. *Swindon Waterworks
Co.* L. R. 9 Ch. 451, 457.

On the one hand the case is not governed by *Fay* v. *Salem &
Danvers Aqueduct Co.* 111 Mass. 27, if the petitioners have the
rights of Humphrey in the pond; on the other hand, testimony
of the value of the water as a source of municipal or other water
supply should not have been received and damages on that ac-
count should not have been allowed to be given in this case, in
which no land had been taken, and the suggested use of the water
was one which the petitioners had no power to make or to allow.
Such evidence was not competent even in the discretion of the
trial judge, as it was said to be in *Sargent* v. *Merrimac,* 196 Mass.
171. And see the cases there cited. So in *In re Lucas & Chester-
field Gas & Water Board,* [1909] 1 K. B. 16, the question was as
to the adaptability of the land taken for use as a reservoir; no
question as to the value of the water was raised.

Accordingly, in any event a new trial must be ordered.

We are of opinion that Humphrey's title to the pond as well as
to the upland became vested in Saltonstall by the levy under the
latter's execution. This is properly to be inferred from the lan-
guage of Saltonstall's deed to Winthrop. *Watuppa Reservoir Co.*
v. *Fall River,* 154 Mass. 305, 306, 307.

In many of the other deeds through which title is traced to the
respective petitioners, the conveyances purport to be of tracts of
land bounded by the pond, or by boundaries described as running
to the pond, or to some monument on the edge of the pond, and
thence along the pond, with no mention sometimes of the pond or
the water, and a mention of them sometimes in the habendum
only and sometimes in the granting part of the deeds.

The established rule to be applied to such boundaries was succinctly stated by Mr. Justice Gray in *Paine* v. *Woods*, 108 Mass. 160, 169, 170: "Unless qualified by restrictive words, they pass the soil towards the centre of the water, as far as the grantor owns. For example, where, as in this Commonwealth, the shore of the sea between high and low water mark is private property, it is included in a grant of land bounded 'by the sea,' or 'harbor,' or 'bay,' or other word descriptive of tide water. *Boston* v. *Richardson*, 105 Mass. 351, 355, and cases cited. . . . In like manner, a grant bounded by a great pond or lake which is public property extends to low water mark." To the same effect are *West Roxbury* v. *Stoddard*, 7 Allen, 158, 167, and *Waterman* v. *Johnson*, 13 Pick. 261, 265.

But this great pond was not public property. As the five hundred acres granted to Humphrey were laid out, they surrounded the pond; and he became the owner of the surrounding land and the bed of the pond and of certain exclusive rights in the water in the pond, though as to the water his rights were not those of an absolute owner, and were subject to the riparian rights of present or future owners of land upon the outlet stream and to the rights of the inhabitants of Saugus and Salem. But in common language he was the owner of the pond, and between himself and those claiming under him the pond was private property. We are of opinion that the boundaries in deeds given by him or them, unless a different intent is manifested in the deeds themselves, must be construed like boundaries upon other privately owned ponds, so as to pass the title to the pond, i. e., to the bed of the pond with the existing rights in the waters, as far as the centre of the pond if the grantor's ownership extended so far. That is the reasonable application of the rule laid down in our decisions. It follows exactly the rule stated in *Boston* v. *Richardson*, 13 Allen, 146, 154: "Whenever land is described as bounded by other land, or by a building or structure, the name of which, according to its legal and ordinary meaning, includes the title in the land of which it has been made part, as a house, a mill, a wharf, or the like, the side of the land or structure referred to as a boundary is the limit of the grant; but when the boundary line is simply by an object, whether natural or artificial, the name of which is used in ordinary speech as describing a boundary, and

not as describing a title in fee, and which does not in its description or nature include the earth as far down as the grantor owns, and yet which has width, as in the case of a way, a river, a ditch, a wall, a fence, a tree, or a stake and stones, then the centre of the thing so running over or standing on the land is the boundary of the lot granted." But in all such cases it is the intention of the parties, as shown by the whole of the deed, in the light of the existing circumstances and the general rules of construction, that determine the interpretation of the words used. *Crocker* v. *Cotting,* 166 Mass. 183. *Haskell* v. *Friend,* 196 Mass. 198. *Frost* v. *Jacobs,* 204 Mass. 1. *Whitney* v. *Miller,* 205 Mass. 448. *Hurd* v. *General Electric Co.* 215 Mass. 358.

In the case at bar, there was no apparent motive for any of the grantors to retain their title to the bed of the pond and their rights in its waters after parting with their upland. To them the pond became of little or no value when severed from the upland. To their grantees it had a real value, and its ownership might and probably would be highly desirable. There can be no presumption of an intent not to pass the whole title of the grantors to both upland and pond. That the boundaries of the side line sometimes ran to a monument (as a pine tree) standing on the edge of the pond and thence along or by the pond, would not prevent the title from passing to the centre of the pond if the grantor's ownership extended so far. *Pinkerton* v. *Randolph,* 200 Mass. 24, 26, 27. Doubtless, under the circumstances of this case, the question was one of law for the court. *Commonwealth* v. *Roxbury,* 9 Gray, 451, 498. *Snow* v. *Orleans,* 126 Mass. 453, 456. For this reason, the "finding" of the auditor, that the different deeds in which parcels of the upland were described as bounding "by the pond," or "on the pond," or as running "to the pond," "did not convey and were not intended to convey any part of the pond or its waters," appears to have been a ruling of law rather than a finding of fact, and to have been erroneous.

But deeds which described the premises conveyed as running "to the edge of the pond," and as being bounded "on the edge of the pond," in the absence of any mention of the pond or of rights in its waters, or any other statement showing a wider intent, passed title only to the low water mark of the pond. *Lufkin* v. *Haskell,* 3 Pick. 356. *Commonwealth* v. *Alger,* 7 Cush.

53, 80. *Whitman* v. *Boston & Maine Railroad,* 3 Allen, 133, 139. *Hamlin* v. *Pairpoint Manuf. Co.* 141 Mass. 51. Presumptively, the owner of a parcel of the upland and of a corresponding part of the bed of the pond, intended them both to pass by a conveyance of the former; but he might convey the one without the other, and if he did so, the title to the other, remaining in himself, would pass to his subsequent grantees or to his heirs or devisees. *Porter* v. *Sullivan,* 7 Gray, 441, 445. *Niles* v. *Patch,* 13 Gray, 254, 257. *Chapman* v. *Edmands,* 3 Allen, 512. *Litchfield* v. *Ferguson,* 141 Mass. 97. *Haskell* v. *Friend,* 196 Mass. 198. *Castor* v. *Smith,* 211 Mass. 473.

We do not think it necessary to go through the numerous deeds under which the respective petitioners make their claims. Their interests depending upon those deeds must be determined by the principles which we have stated, and unless some prescriptive rights shall be found to exist, they must stand or fall accordingly.

What we have said is enough to dispose of the most important points that have been argued. Many other questions, in view of our conclusions, are not likely to arise again in the same form, and need not be examined. We speak only of those which seem likely to become material upon a new trial.

The petitioners who have interests in the bed of the pond and in its waters are entitled respectively to recover whatever damages they have sustained by the loss of the privileges in the pond which belonged as private property exclusively to them and the other owners thereof, including any diminution in the value of their estates by the loss, so far as that has been caused by the respondent's taking, of the right to have the pond in its natural condition abutting upon their estates. The issue was as to the damage which was caused to each owner from the loss of the rights which belonged to him either exclusively or in common with the other owners whose rights came from Humphrey. For the loss of rights or privileges which they shared with the general public, they had no remedy.

The respondent's taking of the water has not been by any written instrument, but by the act of inserting an intake pipe ten feet below the high water mark of the pond. This was the only taking; and it was a valid one, for it was only in case of a

taking of land that the respondent was required to file a paper taking. St. 1881, c. 171, § 5. Consequently the respondent must be treated as having taken the water to the level of this pipe and no more; and damages must be assessed upon that basis. See the cases collected in *Turner* v. *Gardner,* 216 Mass. 65. It is true that the respondent can draw from the pond only so much water as may be required for the wants of the town, present and future; *Bailey* v. *Woburn,* 126 Mass. 416; but the damages must be assessed according to the taking that has been made.

We discover no error in the way in which the judge at the trial dealt with the question whether any prescriptive right in the pond or its waters had been gained or whether any of the rights existing under the grant to Humphrey had been abandoned. The testimony of Danforth was competent upon these contentions, as to the character and intent of any action taken by the public or by individuals. *Enfield* v. *Woods,* 212 Mass. 547, 551. The testimony of the experts as to the value of the pond or its waters was incompetent, as already has been stated. Nor was any evidence as to the value of the pond as a whole admissible. Each petitioner was entitled to recover the damage to his estate, to the land which he owned, according to his interest in the bed of the pond, and his usufructuary rights in its waters.

It is true also that the respondent by its taking did not become the absolute owner of the waters of the pond, or entitled to use them for any other purposes than those stated in the act which authorized the taking, and that all public and private rights not inconsistent with the new and limited right acquired by the respondent remained as before. *Rockport* v. *Webster,* 174 Mass. 385, 392.

The Bradford plan, so called, was admissible to show the claims made by the petitioners. It was not competent as independent evidence of the facts which it purported to show, — the property of each petitioner in the bed of the lake. It was rather a chalk than real evidence.

None of the petitions averred that any land or rights in land had been taken by the respondent or sought to recover damages for such taking. No such taking was testified to or claimed to have been made, or lawfully could have been made under the St. of 1881, c. 171, because no description of any land taken

had been filed as required by that act in case of the taking of land. *Stevens* v. *Worcester, ante,* 128. The judge ought not to have ruled that the respondent had taken an easement in the bed of the pond, or to have allowed the jury to give any damages for such a taking. The easement in the land under the water to support that water existed before the taking and was unaffected by the taking.

We cannot say that the respondent's forty-fifth request * should have been given. The questions about this were for the jury, although, as we have said, the plan furnished no evidence upon them.

The town of Lynnfield acquired its title by a taking for park purposes under the provisions of R. L. c. 28, § 2. Under this statute the town could take land covered by water, and rights in the water as well as upland. Under St. 1893, c. 407, § 4, authorizing the metropolitan park commission to take "lands and rights in land," for "open spaces for exercise and recreation," a taking by that board of a great pond and streams of water, as well as of the land which included them, was treated as valid. *Proprietors of Mills on Monatiquot River* v. *Commonwealth,* 164 Mass. 227. The land taken was described in the instrument of taking as bounded "northerly and easterly by Suntaug Lake, also called Humphrey's Pond." That was sufficient. The rights of the inhabitants of Lynnfield depend upon the same considerations as those of the other petitioners.

In each case the exceptions must be sustained, and there must be a new trial.

*So ordered.*

---

* The ruling asked for in the request referred to was as follows:

"45. Even if the petitioners had any right, title and interest in the land under the pond, or any portion of it, or in the waters of the pond, or any portion thereof, or in the pond itself, there is no sufficient evidence in this case to show what such right, title or interest may be, or where the limits thereof should be drawn, and the extent of such right, title and interest in any event is not in any case as shown upon the plan introduced by the petitioner."